751 A.2d 538

TAMMY S. BLAKEY, PLAINTIFF–APPELLANT, v. CONTINENTAL AIRLINES, INC., A FOREIGN CORPORATION, KAYE V. RIGGS, JOE VACCA, MARK J. FARROW, DONALD JENSEN, DAVE OROZCO AND THOMAS N. STIVALA, DEFENDANTS–RESPONDENTS, AND ABC CORPORATIONS (1–100), STEVE ABDU AND JOHN DOES (1–100), DEFENDANTS.

Argued February 2, 2000—Decided June 1, 2000.

40

42

44

*Linda B. Kenney* argued the cause for appellant (*Kenney Schaer & Martin,* attorneys; *Ms. Kenney* and *Nancy S. Martin,* of counsel and on the brief).

*Robert H. Bernstein* argued the cause for respondent Continental Airlines, Inc., (*Epstein Becker & Green,* attorneys; *Michael D. Markey,* on the brief).

*Ellen M. Boyle* argued the cause for respondents Joe Vacca, Mark J. Farrow, Kaye V. Riggs, Dave Orozco and Thomas N. Stivala (*Satterlee Stephens Burke & Burke,* attorneys).

*Steven H. Isaacson* argued the cause for respondent Donald Jensen (*David S. Springer,* attorney).

The opinion of the Court was delivered by

O'HERN, J.

"According to a venerable principle of disputation, the power to frame the question includes also the power to control the answer." *Des Moines Register & Tribune Co. v. Dwyer,* 542 *N.W.*2d 491, 503 (Iowa 1996)(Harris, J., dissenting). In this employment discrimination case against Continental Airlines and certain of its employees, one way of framing the issues is whether:

1. "If an employer provides an [I]nternet 'forum'—an electronic bulletin board—for employees' use, does it have a duty to monitor e-mail postings to ensure that employees are not harassing one another?" [1]

2. May "a Continental pilot living in Seattle, based out of Houston, [file a complaint in a New Jersey court] about electronic statements on the employee network because Continental was headquartered in New Jersey?" [2]

The answers to those questions are easy. The answers are not quite so easy when the questions are stated as follows:

1. Should an employer, having actual or constructive knowledge that co-employees are posting harassing, retaliatory, and sometimes defamatory, messages about a co-employee on a bulletin board used by the company's employees, have a duty to prevent the continuation of such harassing conduct?

2. Should employees of Continental Airlines reasonably expect to be subject to the personal jurisdiction of New Jersey when (a) they have published in that forum defamatory statements that are intended or are foreseeably likely to injure the co-employee in the exercise of her protected rights to be free from discrimination, and (b) they have done so in retaliation for a co-employee having sought in that forum, where her work activities were centered, the protection of the forum's laws against discrimination?

It seems to us that if the facts are stated thus the answers to the questions should be "yes." Because the facts may be some-

---

[1] Eric D. Randall, *Sexual Harassment Via E–Mail Forum,* 8 *Discrimination L. Update* 29 (1999).

[2] Michael Lampert, *The Internet and Personal Jurisdiction,* 198 *N.J. Lawyer* 47 (1999).

where in between, we cannot provide categorical answers to the questions.

██ The case appears to have proceeded on the thesis that there could be no liability if the harassment by co-employees did not take place within the workplace setting at a place under the physical control of the employer. Although the electronic bulletin board may not have a physical location within a terminal, hangar or aircraft, it may nonetheless have been so closely related to the workplace environment and beneficial to Continental that a continuation of harassment on the forum should be regarded as part of the workplace. As applied to this hostile environment workplace claim, we find that if the employer had notice that co-employees were engaged on such a work-related forum in a pattern of retaliatory harassment directed at a co-employee, the employer would have a duty to remedy that harassment. We find that the record is inadequate to determine whether the relationship between the bulletin board and the employer establishes a connection with the workplace sufficient to impose such liability on the employer. We remand that aspect of the matter to the Law Division for further proceedings in accordance with this opinion.

██ Concerning the issue of personal jurisdiction, we find that defendants who published defamatory electronic messages, with knowledge that the messages would be published in New Jersey and could influence a claimant's efforts to seek a remedy under New Jersey's Law Against Discrimination, may properly be subject to the State's jurisdiction. Although advances in electronic and Internet technology have created new ways to communicate, the sources of personal jurisdiction remain constant. Specific jurisdiction may be exercised over non-resident defendants by applying traditional principles of jurisdictional analysis irrespective of the medium through which the injury was inflicted. Because the record is inadequate to determine the jurisdictional facts, we remand the jurisdictional issues for further consideration.

I.

A.

The facts of the case are more fully set forth in the opinion of the Appellate Division reported at 322 *N.J.Super.* 187, 730 *A.*2d 854 (1999) and in the related opinions of the United States District Court. *Blakey v. Continental Airlines, Inc.,* 992 *F.Supp.* 731 (D.N.J.1998); *Blakey v. Continental Airlines, Inc.,* 2 *F.Supp.*2d 598 (D.N.J.1998). We provide this summary. Tammy S. Blakey, a pilot for Continental Airlines since 1984, appears from the record to be a highly qualified commercial airline pilot. In December 1989, Blakey became that airline's first female captain to fly an Airbus or A300 aircraft (A300). The A300 is a widebody twin-engine jet aircraft seating 250 passengers. *Airbus Industrie* (visited March 13, 2000) <*http://www.airbus.com* >. Plaintiff was one of five qualified A300 pilots in the service of Continental Airlines. Shortly after qualifying to be a captain on the A300, Blakey complained of sexual harassment and a hostile working environment based on conduct and comments directed at her by male co-employees. From 1990 to 1993, Blakey was based in Newark, New Jersey, but lived in Arlington, Washington. According to Blakey, in February 1991, she began to file systematic complaints with various representatives of Continental about the conduct of her male co-employees. Specifically, Blakey complained to Continental's management concerning pornographic photographs and vulgar gender-based comments directed at her that appeared in the workplace, specifically in her plane's cockpit and other work areas.

In February 1993, Blakey filed a charge of sexual discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991 against Continental with the Equal Employment Opportunity Commission in Seattle, Washington, her home state. She simultaneously filed a complaint in the United States District Court in Seattle, Washington, against Continental for its failure to remedy the hostile work environment. Because Blakey's major flight activities had been out of Newark

International Airport, the United States District Court granted Continental's motion to transfer the action to the United States District Court for the District of New Jersey. Continental requested the transfer to New Jersey because Blakey was based in Newark, her allegations were predicated on unlawful employment practices that took place in New Jersey and the Continental personnel responsible for investigating Blakey's complaints also were based in Newark. Continental's motion to transfer was granted on May 13, 1993. At her own request, Blakey transferred to Houston in May 1993. To be relieved of the continuing stress that she had experienced in Newark, Blakey assumed a voluntary unpaid leave of absence beginning in August 1993.

## B.

In the midst of that federal litigation, her fellow pilots continued to publish a series of what plaintiff views as harassing gender-based messages, some of which she alleges are false and defamatory. From February to July 1995, a number of Continental's male pilots posted derogatory and insulting remarks about Blakey on the pilots on-line computer bulletin board called the Crew Members Forum ("Forum"). The Forum is accessible to all Continental pilots and crew member personnel through the Internet provider, CompuServe. When Continental employees access CompuServe, one of the menu selections listed in the "Continental Airlines Home Access" program includes an option called "Continental Forum." Like many other large corporations today, Continental's computer technology operations are "outsourced" or contracted-out, in this case to a company called Electronic Data Systems ("EDS"). EDS manages Continental's information systems including the CMS, which contains information on flights, crew member schedules, pay and pilot pairings. Continental requires that pilots and crew "access" the CMS in order to learn their flight schedules and assignments. To access such a system is, in essence, to call in through a computer or telephone.

Continental personnel access the CMS in three ways. Continental personnel may access the CMS through "dumb terminals" [3] located in crew locations throughout the Continental network through a direct line to Continental's main computer system that is managed by EDS and maintained on a mainframe computer in North Carolina. Flight crew members also may access CMS through a voice response system by dialing into the system on a regular telephone. The third means of access to the CMS is to connect to the system through an Internet service provider [4] (ISP), in this case, CompuServe, a wholly owned subsidiary of America Online, Inc. (AOL). CompuServe is the ISP approved by Continental to provide pilot and crew access to the CMS. To access the CMS through CompuServe, Continental personnel simply need a personal computer, a modem (a device that connects the computer to a phone line), and a phone line. CompuServe provides "membership kits," containing customized computer software to all Continental personnel who may wish to connect to the CMS in this manner. The CompuServe software provides access to the CMS to any individual with a Continental employee identification number that identifies that individual as a pilot or crew member. As part of the package provided to pilots and crew

---

[3] A "dumb terminal" is defined as "a display monitor that has no processing capabilities. A dumb terminal is simply an output device that accepts data from the [central processing unit or "brain" of the computer]. In contrast, a smart terminal is a monitor that has its own processor for special features, such as bold and blinking characters. Dumb terminals are not as fast as smart terminals, and they do not support as many display features, but they are adequate for most applications." *Webopedia* (visited March 30, 2000)<*http://webopedia.com* >.

[4] An Internet service provider (ISP) is defined as "a company that provides access to the Internet. For a monthly fee, the service provider gives you a software package, username, password and access phone number. Equipped with a modem, you can log on to the Internet and browse the World Wide Web ... and send and receive e-mail. In addition to serving individuals, ISPs also serve large companies, providing a direct connection from the company's networks to the Internet.... ISPs are also called IAPs (Internet Access Providers)." *Webopedia* (visited March 30, 2000) <*http://webopedia.com* >.

personnel, CompuServe made the Crew Members Forum available for crew members to exchange ideas and information. According to Continental's witnesses, CompuServe charged $5.80 per hour to provide a direct connection between Continental's main computer system and CompuServe. Three percent of that charge is paid back to Continental to defray any costs incurred by Continental.

CompuServe charges pilots and crew members a monthly fee for Internet access. Perhaps to enhance the appeal of its product, CompuServe provides the Crew Members Forum for pilots and crew members to exchange messages. In the parlance of the Internet, this is described as a virtual community. Community is about communication and interaction among people of shared interests, objectives or purposes. When community members such as employees communicate with each other, they build relationships. *See* Steven L. Telleen, *What It Means To Have Virtual Communities on an Intranet, Internet World,* Nov. 16, 1998 (describing virtual communities and virtual workgroups). "[I]ntranet communities are typically created to improve collaboration and knowledge sharing among employees." Joseph Cothrel, *Virtual Communities Today, The Journal of the Association for Global Strategic Information* (July 1999). The Crew Members Forum essentially serves as an Intranet system.

Access to the Crew Members Forum is available only through CompuServe. The Forum is not accessible through the dumb terminals. The Forum is like a bulletin board where employees can post messages or "threads" for each other. At the time of trial, the Law Division stated that "only 250 employees nationwide had access to the Forum at the time that [ ] defendants published their statements." System operators, or SYSOPS as they are called, provide technical assistance for the Forum. SYSOPS were Continental crew members who volunteered with CompuServe for the position and received no compensation from Continental for that work. Although it was said that Continental management was not permitted to post messages or reply to any messages on the Forum, its chief pilots and assistant chief pilots had access to

the Forum if they signed up with CompuServe to utilize the CMS. Relying on deposition testimony of the Director of Crew Systems and Planning, plaintiff asserts that chief pilots are considered management within Continental.[5] Although Continental may have no duty to monitor the Forum, it is possible that a jury could find that Continental had knowledge, either direct or vicarious through managerial employees, of the content of certain messages posted on the Forum.

## C.

The first messages or "threads" [6] posted about Blakey by various male co-employees appeared in February 1995. On February 2, 1995, Defendant Donald Jensen wrote:

[The female pilots pursuing legal claims] are taking advantage of the fact that they are women to pursue these lawsuits. They see an opportunity to make money out of this situation to the detriment on [sic] their "union brothers" and are pushing it to the limit. If this lawsuit were being filed by a man, what do you think the reaction on this forum would be? It would be ridiculed beyond belief.

On that same day, two other messages were also posted. Defendant Mark Farrow wrote,

---

[5] We are not so certain that a chief pilot's knowledge of the harassing conduct can be imputed to Continental. *See Cavuoti v. New Jersey Transit,* 161 *N.J.* 107, 128–29, 735 *A.*2d 548 (1999) (generally reviewing tiers of management and holding "upper management would consist of those responsible to formulate the organization's anti-discrimination policies, provide compliance programs and insist on performance (its governing body, its executive officers), and those to whom the organization has delegated the responsibility to execute its policies in the workplace, who set the atmosphere or control the day-to-day operations of the unit (such as heads of departments, regional managers, or compliance officers)")

[6] On the Internet ..., a thread is a sequence of responses to an initial message posting. This enables you to follow or join an individual discussion in a [forum or] newsgroup from among the many that may be there. A thread is usually shown graphically as an initial message and successive messages "hung off" the original message. As a [forum or] newsgroup user, you contribute to a thread by specifying a "Reference" topic as part of your message.

[*whatis?com* (visited March 30, 2000) *<http://whatis.com/index.htm >.*]

I strongly believe that [Blakey and another female pilot who had filed suit against Continental] are looking to justify their past records by blaming this pilot group, and holding this company liable for not tipping the scales in their favor.... I don't support harassment of any kind, but do you think these pilots got their reputations just because they are women? I don't! Do you think the company can actually police the thoughts and "writings on the walls" of a few individuals? I don't!

Defendant Thomas Stivala wrote that "Tammy has problems not because she is a woman but because she doesn't possess the skills to interact with crew members effectively."

On February 25, 1995, Defendant Mark Farrow discussed Blakey and another female pilot who had apparently filed a suit against Continental. He described them as

opportunists who choose to blame everyone else for there [sic] inabilities to perform to standards. Such is the case with both of these individuals. They are weak pilots by reputation, and have alienated themselves from their peers with their boorish behavior. They seek to justify their inadequacies with lawsuits that blame you and I for their shortcomings; as well they seek a windfall at all of our expense!

In March 1995, Defendant Joe Vacca stated that he was "curious if Ms. Blakey will reimburse [Continental] for the: 1) Engine she overtemped and destroyed. 2) The $250,000 in hail damage done when she flew through the TRW, with the F/O trying to tell her not to go through the WX [weather] etc. etc." In the same thread, he also said that

I am personally and professionally disgusted with [ ] individuals crying the blues through the legal system, chisling [sic] money out of all of our pockets in the long run, and using this issue for personal financial gains.... [I]f the porn bothers you, don't look. I am just as offended with all the religious material that is showing up lately on the B737. But I don't go crying to the CPO. I leave it for what it's worth.

On July 15, 1995, Vacca sent another message to a female Continental pilot named Nancy Novaes. In that communication, he stated

[t]he closest I have ever come to wetting my pants in an airplane was when [Blakey] was in a window seat. I'm sure that my recollections of this wonderful trip will then be "gender biased". .. Now don't start your feminazi routine with me (remember awhile back you did say you were my favorite feminazi). I don't have a gender problem here. In fact if the PERSON involved was named Tommy

Blakey I would be just as scathing. I think what she is doing is reprehensible, cheap and is another example of how warped the justice system has become.

## On July 21, 1995, Vacca transmitted the following message:

Lawsuit, lawsuits lawsuits. That is all we hear about Tammy Blakey. You need to prey on a legal system that does not stand up to people who are vexatious and try to get even for their own lack of interpersonal skills.

. . .

In my opinion, you are a wart (really bad choice of words with your ALLEGED problem) on the judicial system. I have zero respect for you and your kind.

## Ten days later, Vacca again communicated with Nancy Novaes. He stated

[p]erhaps Kaye [Riggs] and I are the only ones with the balls (really bad choice of words huh Nancy?) to stand up and disagree with the feminazis among us.

### On July 14, 1995, Defendant Kaye Riggs [7] stated

[m]y point with Tammy is that she doesn't really belong here anyway, at least to my mind, and I, personally, don't care what she has to say about anything. I believe her lawsuit is bogus, the charges patently false, and that she is out to get a quick buck. Why don't you ask her about the training she was given, far in excess of the sylabus [sic], just to be able to pass the PC's?

A few days later, Riggs communicated to Blakey directly "about the engine(s) on the A–300 you burned up by overtemping?" He asked if this was "[a]nother male lie?" In another thread, Riggs stated

... I also heard you crashed your floatplane ... is this a damned lie too? I only have second-hand word of this but, since you might like to sue this person, too. I'm afraid I can't reveal my sources ...

Also, is your lawsuit against me in the works? Just checking ...

Blakey later certified that she has "never crashed a floatplane, ... never took training 'far in excess of the syllabus in order to pass her PC's, and never 'burned up' an engine and caused $250,000 in damage when [she] flew with TRW."

---

[7] Defendant Kaye Riggs is a male.

## D.

In August 1995, Blakey sought to amend her federal complaint against Continental to add these allegedly defamatory remarks as the basis for an additional cause of action and as further support for her claim of a hostile environment. The federal court denied leave to amend because "[p]laintiff [had] other judicial recourse available to pursue her claims." In December 1995, Blakey filed this complaint in Superior Court seeking "other judicial recourse" against Continental and the pilots alleging defamation, sexual harassment/hostile work environment, business libel, and intentional infliction of emotional distress. In August 1996, Continental moved for partial summary judgment on the claims of defamation, business libel, and intentional infliction of emotional distress. Individual defendants Riggs, Vacca, Abdu, Farrow, Orozco, and Stivala also filed a motion to dismiss for lack of personal jurisdiction[8]. In April 1997, the Law Division granted the pilots' motion[9] as well as Continental's motion.

In December 1997, Continental filed a motion for summary judgment on the remaining hostile environment workplace claim, which was subsequently granted in April 1998.

Meanwhile, the federal litigation proceeded to conclusion. In October 1997, a jury in the United States District Court for the District of New Jersey found in favor of Blakey on the claim of sexual harassment, awarding her "$480,000 in back pay, $15,000 in front pay, and $500,000 for emotional distress, pain and suffering, but did not award any punitive damages. The jury also found that Blakey had failed to mitigate damages, and subtracted $120,000

---

[8] Don Jensen did not join in the motion to dismiss; however, the complaint against him was dismissed on July 28, 1997.

[9] The motion to dismiss was initially not granted in favor of one of the pilots, Steve Abdu, a New Jersey resident. Although the Law Division found that Abdu was subject to personal jurisdiction in New Jersey in April 1997, all claims against Abdu were subsequently dismissed in March 1998 because his statements were found to be not actionable.

from her back pay award of $480,000." *Blakey v. Continental Airlines, Inc., supra,* 992 *F.Supp.* at 734. The $500,000 award for emotional distress, pain and suffering was subsequently halved. *Id.* at 742.

Returning our attention to these State proceedings, we find that on plaintiff's appeal the Appellate Division held that the court lacked personal jurisdiction over the individual defendants, and that Continental was not vicariously liable for defamatory statements made by the pilots. *Blakey v. Continental Airlines, Inc., supra,* 322 *N.J.Super.* 187, 730 *A.2d* 854. In its decision, the Appellate Division

> canvassed the law on the issue of personal jurisdiction of defamation claims based on electronic communications ... [and agreed with the trial court that the] common thread that runs through each of the reported decisions is that non-resident defendants may be subject to personal jurisdiction solely on the basis of their electronic contacts only when they specifically direct their activities at the forum, the plaintiff is a resident of the forum, and the brunt of the injury is felt in the forum state.
>
> [*Id.* at 205, 730 *A.2d* 854.]

Concerning Continental's liability, the Appellate Division reasoned that

> [w]hile Continental provided pilots with the means to access the CMS, utilized that system to convey important information necessary for the pilots' performance of their jobs, and relied on its pilots to use the CMS for a variety of purposes, no such evidence was presented with regard to the Forum. Indeed, the record demonstrates that Continental did not require employees to utilize the Forum. Stated differently, the decision to use the Forum rests solely with the employee, and the employee, not Continental, bears the cost of any use. Regardless of whether the threads were defamatory, plaintiff has established no basis for Continental's liability under the doctrine of *respondeat superior.*
>
> [*Id.* at 213, 730 *A.2d* 854.]

We granted plaintiff's petition for certification. 162 *N.J.* 126, 741 *A.2d* 94 (1999).

## II.

### A.

We do not purport to be experts on the complexities of the Internet or other forms of electronic communication, whether

wired or wireless. We have made every effort, however, to describe the relationship between the Crew Members Forum and Continental Airlines in the language of those who do not possess a sophisticated knowledge of current computer technology.

To put the issue in perspective, we need to shrink the context a bit. There was a television series a few years ago called "Wings." *Wings* (NBC television broadcast, April 1990 through May 1997). The program concerned a small, regional airline, its pilots, ground crew and maintenance people. If there were at that small airport a lounge used exclusively by the pilots and crew of that airline and a bulletin board in that lounge contained the same or similar comments and asides by the pilots and crew, there would be little doubt that if management had notice of messages that met the required substantive criteria of being "sufficiently severe or pervasive to alter the conditions of employment and to create an intimidating, hostile, or offensive working environment," *Lehmann v. Toys 'R' Us, Inc.*, 132 *N.J.* 587, 592, 626 *A.*2d 445 (1993), a cause of action for hostile work environment sexual harassment could be asserted. And if there had been a nearby place frequented by senior management, pilots and crew where one of the crew was regularly subjected to sexually offensive insults and if that harassing conduct was a continuation of a pattern of harassment in the workplace, an employer that had notice of the pattern of severe and pervasive harassment in and out of the workplace, would not be entirely free to disregard the conduct.

The question in this more complex case is whether the Crew Members Forum is the equivalent of a bulletin board in the pilots' lounge or a work-related place in which pilots and crew members continue a pattern of harassment. The trial court correctly perceived the role of the Forum when it asked:

So what's the difference? What's the critical difference now we've taken it off this wood and whatever it is, cork material, that a bulletin board is made out of, and now we've electronically put it on the Internet. Now, what are the critical differences that now take it out of something that Continental could be responsible for as a workplace, or work-related item.

## B.

This Court has recognized that harassment by a supervisor that takes place outside of the workplace can be actionable. *American Motorists Ins. Co. v. L–C–A Sales Co.,* 155 *N.J.* 29, 42, 713 *A.*2d 1007 (1998). In *American Motorists,* the Court "note[d] that whether specific acts of harassment or discrimination took place outside of the workplace, such as harassing telephone calls . . ., is of no consequence because such conduct nevertheless would have arisen out of the employment relationship between [the plaintiff and the defendant corporation]." *Ibid.*

Thus, standing alone, the fact that the electronic bulletin board may be located outside of the workplace (although not as closely affiliated with the workplace as was the cockpit in which similar harassing conduct occurred), does not mean that an employer may have no duty to correct off-site harassment by co-employees. Conduct that takes place outside of the workplace has a tendency to permeate the workplace. *See Schwapp v. Avon,* 118 *F.*3d 106, 111 (2d Cir.1997) (finding that "[t]he mere fact that [the plaintiff] was not present when a racially derogatory comment was made will not render that comment irrelevant to his hostile work environment claim."). A worker need not actually hear the harassing words outside the workplace so long as the harassment contributes to the hostile work environment. *Ibid. See also* Young, Conaway, Stargatt & Taylor, *Six Sexual Harassment Myths Shattered,* 2 No. 4 *Del. Employment L. Letter* 1 (April 1997)(observing that "[i]t is clear today that the fact that the harassment occurred away from the workplace will carry little weight with the courts.").

In a case involving harassment that occurred in a tavern outside of the workplace, the New Hampshire federal court refused to dismiss any evidence of harassment related to activities. at the tavern on the basis that the conduct was irrelevant. (There had been harassment taking place in the workplace.) The court observed that "[a]n employer's liability for a hostile environment caused by lower-level supervisory employees or plaintiff's co-

workers exists, 'if an official representing the institution knew, or in the exercise of reasonable care, should have known, of the harassments occurrence, unless that official can show that he or she took appropriate steps to halt it.'" *McGuinn–Rowe v. Foster's Daily Democrat*, 1997 *WL* 669965, *4 (D.N.H.1997) *quoting Lipsett v. University of Puerto Rico*, 864 *F.*2d 881, 901 (1st Cir.1988). "Given that [the] plaintiff experienced harassment at the work site and the incident at the bar may have formed part of a pattern of such harassment, the bar incident may well be relevant to the issue of whether [the] plaintiff experienced a hostile environment at her place of work." *Id.* at *3.

In *Lehmann v. Toys 'R' Us, Inc., supra*, 132 *N.J.* at 623, 626 *A.*2d 445, a case of harassment committed in the workplace, this Court set forth the liability standards for an employer who fails to prevent and promptly correct offending behavior in a workplace setting:

Although an employer's liability for sexual harassment of which the employer knew or should have known can be seen to flow from agency law, it also can be understood as direct liability. When an employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser. "Effective" remedial measures are those reasonably calculated to end the harassment. The "reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment."

[ (citations omitted).]

The Second, Sixth and Tenth Circuits have held that "an employer can be liable for co-workers' retaliatory harassment." *Morris v. Oldham County Fiscal Court*, 201 *F.*3d 784, 791 (6 th Cir.2000); *see also Richardson v. New York State Dept. of Correctional Service*, 180 *F.*3d 426, 446 (2nd Cir.1999)("an employer [can] be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it."); *Gunnell v. Utah Valley State College*, 152 *F.*3d 1253, 1265 (10th Cir.1998)("an employer can [ ] be liable for co-workers' retaliatory harassment where its supervisory or management personnel ... know about the harassment and acquiesce in it in such

a manner as to condone and encourage the co-workers' actions."); *Knox v. State of Indiana*, 93 *F*.3d 1327, 1334 (7th Cir.1996)("Nothing indicates why a different form of retaliation—namely, retaliating against a complainant by permitting [his or] her fellow employees to punish [him or] her for invoking [his or] her rights under Title VII—does not fall within the statute.").

## C.

Plaintiff alleges that she gave notice to Continental as early as March 1995 by forwarding copies of the offending "threads" to Continental's counsel as notice of the continuing harassment. If such notice was given, Continental's liability will depend on whether the Crew Members Forum was such an integral part of the workplace that harassment on the Crew Members Forum should be regarded as a continuation or extension of the pattern of harassment that existed in the Continental workplace.

■■■■ Our common experience tells us how important are the extensions of the workplace where the relations among employees are cemented or sometimes sundered. If an "old boys' network" continued, in an after-hours setting, the belittling conduct that edges over into harassment, what exactly is the outsider (whether black, Latino, or woman) to do? Keep swallowing the abuse or give up the chance to make the team? We believe that severe or pervasive harassment in a work-related setting that continues a pattern of harassment on the job is sufficiently related to the workplace that an informed employer who takes no effective measures to stop it, "sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser." *Lehmann v. Toys 'R' Us, supra,* 132 *N.J.* at 623, 626 *A*.2d 445.[10] Of course, if references are made here to

[10] Women were perhaps overly sanguine in 1984 following the Supreme Court's decision in *Hishon v. King & Spalding,* 467 *U.S.* 69, 104 *S.Ct.* 2229, 81 *L.Ed.*2d 59 (1984), holding that women could claim bias in partnership decisions by employers. Some said that the decision "proclaimed the end of the 'old boys' network.' " Elizabeth Ward Kalb, *Ethical Choices, A Look at the Legal Revolu-*

the pattern of harassment that was the subject of the federal lawsuit as a connection to the claims of retaliatory harassment, care must be taken to insure that no damages may be claimed or awarded on account of that prior pattern. *See Wilson v. Wal–Mart Stores,* 158 *N.J.* 263, 275, 729 *A.2d* 1006 (1999)(explaining how damages should be separated for overlapping patterns of harassment).

## D.

On remand, the trial court should first determine whether Continental derived a substantial workplace benefit from the overall relationship among CompuServe, the Forum and Continental. The record does not disclose that Continental sought the Forum's inclusion on CompuServe's menu. Still, it appears to us that a business enterprise would derive the same benefits from having its employees connected as would a law firm, *see* Eric G. Kraft, *The Increasing Use of the Internet in the Practice of Law,* 69 *J. Kan. B.A.* 15, 17 (Feb.2000), or the judiciary itself. We have become familiar with the process through which the judiciary's employees and its several jurisdictions may be connected by the Internet. That process is well known by now. *See* Dennis L. Greenwald, *The 21 [st] Century Office ... It's Not Your Father's Office Any More,* 14 *Prob. & Prop.* 9 (Feb.2000)(observing that "high speed telecommunications, telecommuting and other 'live-work' models, the 'paperless workplace' and the personal computer as the 'virtual office' seem permanent fixtures of tomorrow's workplace"). The problems that developed in our fathers' offices

---

tion, *The National Law Journal,* April 9, 1990, at 16. Apparently not so. Old habits die hard. While Hishon's suit was pending in the Supreme Court, it was reported that the firm considered holding a wet t-shirt contest for the firm's summer associates. Nina Burleigh & Stephanie B. Goldberg, *Breaking the Silence: Sexual Harassment in Law Firms, A.B.A.J.,* Aug. 1989, at 46. Such off-site activities are often an important part of a firm's business culture. Male business partners often take clients at the firm's expense to clubs that do not allow women or minorities. Gary Blankenship, *Women Lawyers Report Unequal Treatment, Florida Bar News,* Aug. 1, 1993, at 1.

are likely to develop in the offices of the future. Business counselors caution employers that they should have policies that deal with sexual harassment on the message centers of this changing world. Diana J.P. McKenzie, *Information Technology Policies: Practical Protection in Cyberspace*, 3 *Stan. J.L. Bus. & Fin.* 84 (Winter 1997). That does not mean that employers have a duty to monitor employees' mail. Grave privacy concerns are implicated. Todd M. Keebaugh, *The Virtual Office: Practical Considerations in Establishing and Implementing a Telecommuting Program*, 16 No. 5 *ACCA Docket* 16, 22 (Sept./Oct.1998). It may mean that employers may not disregard the posting of offensive messages on company or state agency e-mail systems when the employer is made aware of those messages. Anne Sexton, *Parkway Suspends Three, and Others Squirm as E–Mail Is Reviewed, Newark Star Ledger*, March 15, 2000, at 1.

The Law Division should initially determine whether a triable issue of fact is presented concerning whether the Crew Members Forum should be considered sufficiently integrated with the workplace to require such a response by an employer. For example, the record does not contain the contract between CompuServe and Continental. In addition, at the time of these proceedings, use of the Internet was in the beginning stages. The number of current users would be relevant to the benefit that Continental might derive from the service. It appears to us likely that Continental crew members who subscribed to CompuServe did so because of access to the CMS. In essence, Continental "outsourced" what another organization might call its own network. When a crew member accesses the CMS through CompuServe, the menu of options listed under the "Continental Airlines Home Access" includes both the "Crew Services/Forum" and "Continental Forum." The ability of Continental employees to access the information provided on the CMS benefits Continental by improving its efficiency and operations. *See* Paul M. Schwartz, *Privacy and Democracy in Cyberspace*, 52 *Vand. L.Rev.* 1609, 1620 n. 61 (November 1999)(citing Carl Shapiro & Hal R. Varian, *Information Rules: A Strategic Guide to the Network Economy* 13–14

(1999) at 183–84 identifying the benefits of a network, which "include an increased access to information, an increased ease of communication, and a decrease in a variety of transaction and overhead costs"). The ability of the Continental employees to communicate with each other on the Forum would likewise appear to be a benefit.

CompuServe's role may thus be analogized to that of a company that builds an old-fashioned bulletin board. If the maker of an old-fashioned bulletin board provided a better bulletin board by setting aside space on it for employees to post messages, we would have little doubt that messages on the company bulletin board would be part of the workplace setting. Here, the Crew Members Forum is an added feature to the company bulletin board.[11]

To repeat, employers do not have a duty to monitor private communications of their employees; employers do have a duty to take effective measures to stop co-employee harassment when the employer knows or has reason to know that such harassment is part of a pattern of harassment that is taking place in the workplace and in settings that are related to the workplace. Besides, it may well be in an employer's economic best interests to adopt a proactive stance when it comes to dealing with co-employee harassment. The best defense may be a good offense against sexual harassment. "[W]e have afforded a form of a safe haven for employers who promulgate and support an active, anti-harassment policy." *Cavuoti, supra,* 161 *N.J.* at 121, 735 *A.2d* 548. Effective remedial steps reflecting a lack of tolerance for harassment will be "relevant to an employer's affirmative defense that its actions absolve it from all liability." *Payton v. New Jersey Turnpike Auth.,* 148 *N.J.* 524, 536–37, 691 *A.2d* 321 (1997).

---

[11] The corollary to this is that we should not hold the maker of the bulletin board liable for the statements that are placed on it. We therefore would hesitate to hold as did an English court that an Internet service provider should be liable for defamatory messages posted thereon by others. Sarah Lyall, *British Internet Provider to Pay Physicist Who Says E–Bulletin Board Libeled Him, The New York Times,* April 1, 2000, at A5.

Surely an anti-harassment policy directed at any form of co-employee harassment would bolster that defense.

### III.

### A.

The more difficult issue in this case is that of personal jurisdiction over the pilots who are alleged to have defamed the plaintiff in apparent retaliation for her assertion of rights protected under New Jersey's Law Against Discrimination.[12]

The parties have viewed the case as presenting novel issues of Internet jurisdiction. "Sexual harassment is not new, but the expansion of computer networks has seen a new form of communication develop that current law is ill-equipped to confront." David K. Mcgraw, *Sexual Harassment in Cyberspace: The Problem of Unwelcome E-mail,* 21 *Rutgers Computer & Tech. L.J.* 491 (1995). This case is a poor vehicle through which to explore the complexities of personal jurisdiction in an age of electronic commerce:

> In recent years, scholars have debated whether the Internet is a unique environment that requires a new set of legal rules. Many believe that the Internet should be governed in a manner suited to its particular history, customs, and technological capabilities. The question that remains is how different Internet governance should be in order to accommodate the Internet's novel circumstances and adapt to explosive growth in users, commerce, and political stakeholders.
>
> [*Developments in the Law—The Law of Cyberspace—The Domain Name System: A Case Study of the Significance of Norms to Internet Governance,* 112 *Harv. L.Rev.* 1657 (May 1999)(internal footnotes omitted).]

---

[12] In 1996, each defendant pilot submitted a certification in support of his motion to dismiss for lack of personal jurisdiction. Joe Vacca stated that he lived in Colorado, but was based out of Newark from March 1994 to May 1994 and reassigned there again in June 1996. Mark Farrow stated that he lived in Colorado and had worked in Texas from 1991. Kaye Riggs lived in California for most of his life, worked in Houston, and only worked in New Jersey when assigned to the Newark base during an employee shortage in June 1995 and May to June 1996. Thomas Stivala and Dave Orozco had lived and worked in Texas since the early to mid 1990's. Donald Jensen certified in 1997 that he had lived in Texas for the previous nine years and had never lived or worked in New Jersey.

We leave to the proper commercial setting those complex issues. An example will suffice:

[T]ake the following scenario: assume that a New Yorker flying over Ohio engages in an in-flight video conference call with a Californian, temporarily in Hawaii, via a modem in his laptop computer. Then, during the conversation, the Californian sends a contract of sale to the New Yorker who ends the conference call, goes off-line, and edits the contract attaching his electronic signature to it. While over Denver, the New Yorker e-mails the "signed" contract to the Californian. Now suppose that the Californian claims he did not receive the signed contract and refuses to deliver the goods. Where can suit be brought? Where should suit be brought?

Under the current scheme, we would look to the connections that the California defendant has with any particular forum state. Among these we would include the physical Internet contacts, the act of sending the e-mail while over Denver, receipt of the contract while over Ohio, sending the contract from Hawaii, etc. Should it matter where any of these events took place, or should we instead focus on the volitional acts of the parties and their accompanying effects?

[Todd D. Leitstein, *A Solution for Personal Jurisdiction on the Internet,* 59 *La. L.Rev.* 565, 569 (Winter 1999).]

A body of law is developing in this area. *See, e.g.,* John Rothchild, *Protecting the Digital Consumer: The Limits of Cyberspace Utopianism,* 74 *Ind. L.J.* 893, 979, n. 341 (Summer 1999)(noting that "[c]ourts that have found personal jurisdiction based on the maintenance of a Web site have usually relied upon additional factors tending to a finding that the defendant purposely availed itself of the privilege of doing business within the forum state").

## B.

Rather than to attempt to create a new order of jurisdictional analysis adapted to the Internet, we prefer in this case to adhere to the basics. At one time, the principles of personal jurisdiction were based on concepts of power: Did the State have power over the person or property? The exercise of that power depended on the physical presence of the subject person or property within the territory of the forum state.

The landmark case of *Pennoyer v. Neff,* 95 *U.S.* 714, 733, 24 *L.Ed.* 565, 572 (1877), held that the judgment of a court lacking personal jurisdiction violated the Due Process Clause of the Fourteenth Amendment. Perhaps influenced by Austinian con-

cepts of law, *Pennoyer* held that jurisdiction to adjudicate derived from a "power" theory of a state's "exclusive jurisdiction and sovereignty over persons and property within its territory." 95 *U.S.* at 722, 24 *L.Ed.* at 568.

> In the late 19th and early 20th centuries, changes in the technology of transportation and communication, and the tremendous growth of interstate business activity, led to an "inevitable relaxation of the strict limits on state jurisdiction" over nonresident individuals and corporations. *Hanson v. Denckla,* 357 *U.S.* 235, 260, 78 *S.Ct.* 1228, 1243, 2 *L.Ed.*2d 1283 (1958)(Black, J., dissenting).
>
> [*Burnham v. Superior Court,* 495 *U.S.* 604, 617, 110 *S.Ct.* 2105, 2114, 109 *L.Ed.*2d 631, 643 (1990).]

The Supreme Court formerly resorted to various fictions, such as implied consent in order to sustain personal jurisdiction. *E.g., Hess v. Pawloski,* 274 *U.S.* 352, 47 *S.Ct.* 632, 71 *L.Ed.* 1091 (1927). Eventually, in *International Shoe Co. v. Washington,* the Court cast those fictions aside and held that a state court's assertion of personal jurisdiction does not violate the Due Process Clause if the defendant has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 *U.S.* 310, 316, 66 *S.Ct.* 154, 158, 90 *L.Ed.* 95, 102 (1945) (*quoting Milliken v. Meyer,* 311 *U.S.* 457, 463, 61 *S.Ct.* 339, 343, 85 *L.Ed.* 278, 283 (1940)). The concomitant understanding of legislative jurisdiction was similarly modified:

> Until recently, it was unclear whether the due process limitation upon a state's extraterritorial application of law mirrored the due process analysis for determining the limits of a state court's judicial jurisdiction. The concepts are closely linked, and commentators have suggested that essentially the same principle should be applied with reference to both situations.
>
> [*McCluney v. Jos. Schlitz Brewing Co.,* 649 *F.*2d 578, 581 (8th Cir.), *aff'd,* 454 *U.S.* 1071, 102 *S.Ct.* 624, 70 *L.Ed.*2d 607 (1981).]

In *Allstate Insurance Co. v. Hague,* 449 *U.S.* 302, 312–13, 101 *S.Ct.* 633, 640, 66 *L.Ed.*2d 521, 531 (1981), the Court said that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."

█ Thus, a state may regulate conduct occurring outside its borders. In the criminal context, "[t]he common law adopts as the principal basis of jurisdiction a territorial theory of jurisdiction over crimes: a state has power to make conduct or the result of conduct a crime if the conduct takes place or the result happens within its territorial limits." 1 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 2.9(a), at 180 (1986) (footnotes omitted). The New Jersey Code of Criminal Justice reflects that understanding of a state's jurisdiction. A person may be convicted under the laws of this State of an offense if "[e]ither the conduct which is an element of the offense or the result which is such an element occurs within this State." *N.J.S.A.* 2C:1–3a(1).

█ To repeat, the test for "due process requires only that in order to subject a defendant to a judgment in personam, if he [or she] be not present within the territory of the forum, he [or she] have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington, supra,* 326 *U.S.* at 316, 66 *S.Ct.* at 158, 90 *L.Ed.* at 102 (*quoting Milliken v. Meyer,* 311 *U.S.* 457, 463, 61 *S.Ct.* 339, 343, 85 *L.Ed.* 278, 283 (1940)). Those unchanging commands of due process govern every foray into the realm of long-arm jurisdiction over non-residents. *Jacobs v. Walt Disney World, Co.,* 309 *N.J.Super.* 443, 452, 707 *A.*2d 477 (App.Div.1998) (*citing Avdel Corp. v. Mecure,* 58 *N.J.* 264, 268, 277 *A.*2d 207 (1971)).

## C.

*(1) Did defendants have the requisite "minimum contacts" with New Jersey?*

█ The first step is to determine whether defendants have had the requisite minimum contacts with New Jersey. We evaluate the minimum contacts of a defendant on a case-by-case basis. *Waste Management, Inc. v. Admiral Ins. Co.,* 138 *N.J.* 106, 122, 649 *A.*2d 379 (1994), *cert. denied sub nom. WMX Tech., Inc. v.*

*Canadian Gen. Ins. Co.,* 513 *U.S.* 1183, 115 *S.Ct.* 1175, 130 *L.Ed.*2d 1128 (1995).

In the context of specific jurisdiction, the minimum contacts inquiry must focus on "the relationship among the defendant, the forum, and the litigation." *Shaffer v. Heitner,* 433 *U.S.* 186, 204, 97 *S.Ct.* 2569, 2579, 53 *L.Ed.*2d 683, 698 (1977) (mere presence in the forum state of defendant's property that is unrelated to the cause of action is insufficient to establish personal jurisdiction), *quoted in Keeton v. Hustler Magazine, Inc.,* 465 *U.S.* 770, 775, 104 *S.Ct.* 1473, 1478, 79 *L.Ed.*2d 790, 798 (1984) (defendant's regular circulation of magazine in forum state is sufficient to establish personal jurisdiction over libel action); *Calder v. Jones,* 465 *U.S.* 783, 789, 104 *S.Ct.* 1482, 1486, 79 *L.Ed.*2d 804, 811–12 (1984) (defendant is subject to personal jurisdiction based solely on alleged intentional and libelous conduct in Florida "expressly aimed at California"). The "minimum contacts" requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff. *World–Wide Volkswagen Corp. v. Woodson,* 444 *U.S.* 286, 297–98, 100 *S.Ct.* 559, 567–68, 62 *L.Ed.*2d 490, 501–02 (1980). .

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 *U.S.* 462, 475, 105 *S.Ct.* 2174, 2183, 85 *L.Ed.*2d 528, 542 (1985) (*quoting Keeton, supra,* 465 *U.S.* at 774, 104 *S.Ct.* at 1478, 79 *L.Ed.*2d at 797; *World–Wide Volkswagen, supra,* 444 *U.S.* at 299, 100 *S.Ct.* at 568, 62 *L.Ed.*2d at 502). The question is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen, supra,* 444 *U.S.* at 297, 100 *S.Ct.* at 567, 62 *L.Ed.*2d at 501.

[*Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 323–24, 558 *A.*2d 1252 (1989).]

"An intentional act calculated to create an actionable event in a forum state will give that state jurisdiction over the actor." *Waste Management, supra,* 138 *N.J.* at 126, 649 *A.*2d 379 (*citing Calder v. Jones, supra,* 465 *U.S.* at 791, 104 *S.Ct.* at 1488, 79 *L.Ed.*2d at 813) (holding that California could properly impose personal jurisdiction over non-resident tabloid writers because "their intentional conduct in Florida [was] calculated to cause injury to respondent in California.").

 In this case, the question is whether the harassment was expected or intended to cause injury in New Jersey. "The fact that the actions causing the effects in [New Jersey] were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects."

*Calder, supra,* 465 *U.S.* at 787, 104 *S.Ct.* at 1485, 79 *L.Ed.*2d at 810.

If this case had arisen just a few years ago and the offending communications had been placed in The New York Times or U.S.A. Today, with the expectation or intent that the publications would affect the pursuit of Blakey's LAD claims in New Jersey, we would have little difficulty in exercising jurisdiction over the defamatory statements. The messages would have been published in New Jersey, albeit in print versus electronic form. A claimant who was in the process of vindicating her rights in a forum in New Jersey would surely feel the effect here. It would be a paradox if electronic communications, with their instantaneous messaging, would lessen the jurisdictional power of a state.

In the past, this Court has concluded that the means by which a message is communicated is not as important as the quality of the contact. Thus, the critical factor is not the transmittal of messages by mail or telephone within the state, it is the nature of the contact. *Baron & Co. v. Bank of N.J.,* 497 *F.Supp.* 534, 538 (E.D.Pa.1980) (noting fact that defendant had made phone calls, mailed checks, and sent correspondence to plaintiff in Pennsylvania was not sufficient to draw defendant into Pennsylvania for purposes of personal jurisdiction); *Pennsylvania Mfrs. Ass'n Ins. Co. v. Township of Gloucester,* 493 *F.Supp.* 1047, 1049 (E.D.Pa.1980) (holding that Pennsylvania insurer could not sue foreign municipality in forum state despite two complaint letters sent to insurer in forum state). On the other hand, when a merchant uses the instrumentalities of commerce to tap an interstate market for its product, such wire and mail communications are relevant contacts to be considered. *United Coal Co. v. Land Use Corp.,* 575 *F.Supp.* 1148, 1157 (W.D.Va.1983) (observing that "[t]elephone conversations, telexes and letters traveled to and from the state, establishing an agreement" considered as part of the contacts sustaining jurisdiction of the forum); *Hoster v. Monongahela Steel Corp.,* 492 *F.Supp.* 1249, 1253 (W.D.Okla.1980) (concluding that defendants who made several telephone calls to

plaintiff, corresponded twice with plaintiff, and sent agent to negotiate with plaintiff held to have sufficient contacts to establish jurisdiction in plaintiff's state). We are satisfied that if defendants' statements are capable of a defamatory meaning and were published with knowledge or purpose of causing harm to plaintiff in the pursuit of her civil rights within New Jersey, those intentional contacts within the forum would satisfy the minimum contacts requirement of *International Shoe.*

*(2) Would the assertion of jurisdiction affect traditional notions of fair play and substantial justice?*

In terms of such "fairness," we consider the factors set forth in *Asahi Metal Industry Co., Ltd. v. Superior Court,* 480 *U.S.* 102, 107 *S.Ct.* 1026, 94 *L.Ed.2d* 92 (1987). Those factors include "the burden on defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in efficient resolution of disputes, and the shared interest of the states in furthering fundamental substantive social policies." *Waste Management, supra,* 138 *N.J.* at 125, 649 *A.*2d 379 (citing *Lebel, supra,* 115 *N.J.* at 328, 558 *A.*2d 1252).

In this context, that is the flip-side of the purposeful availment doctrine, we may ask whether the offending party could reasonably anticipate that the forum state would have a substantial interest in vindicating the personal rights of the injured party. Examples of a forum's interest in deterring conduct that takes place outside of the forum may be drawn from criminal and administrative law. *See Silverman v. Berkson,* 141 *N.J.* 412, 421–22, 661 *A.*2d 1266 (1995)(holding that the "power to exert authority over nonresidents exists as a matter of sovereignty"). In the enforcement of anti-discrimination laws, the jurisdictional focus is on the forum where the effect of discrimination occurs. *McDonnell v. State of Ill.,* 163 *N.J.* 298, 748 *A.*2d 1105 (2000).

Because defamation was alleged to be part of the harassing conduct that took place on the Crew Members Forum, it would be fair to posit jurisdiction where the effects of the harassment

were expected or intended to be felt. The center of gravity of this employment dispute was in Newark, New Jersey. Early in the federal case, Continental had claimed that "the evidence of a hostile environment in locations other than Newark [was] irrelevant to Plaintiff's claim." *Blakey v. Continental Airlines, Inc.,* 1995 *WL* 464477, *4 (D.N.J.). But as Judge Bassler pointed out in the court's opinion, "the *Lehmann* Court declared, '[e]vidence of sexual harassment directed at other women is relevant to both the character of the *work environment and its effects on the complainant.*'" *Ibid.* (quoting *Lehmann v. Toys 'R' Us, supra,* 132 *N.J.* at 611, 626 *A.*2d 445) (emphasis added). The effect of retaliatory falsehoods on the worker could reasonably influence the anti-discrimination policies of the forum by deterring her resolve. In these circumstances, we do not believe that it is unfair that the forum where the discrimination took place should exercise jurisdiction over the allegations of defamatory retaliatory harassment.

## D.

However, in fairness to defendants, we cannot determine whether they knew that at the time of their defamatory statements plaintiff was actually pursuing this action in New Jersey. We find no indication that discovery from the individual defendants has been obtained. Under the second prong of *International Shoe,* it may simply not be fair to invoke the jurisdiction of the State of New Jersey. Questions to be answered are whether the pilots knew that plaintiff was seeking to vindicate her rights in New Jersey and whether they knew that their messages would be published in the forum.

Defenses including the lack of personal jurisdictional "shall be heard and determined before trial on application of any party, unless the court orders that the hearing and determination thereof be deferred until the trial." *Fed.R.Civ.P.* 12(d). "[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of

factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Augustine v. United States,* 704 *F.*2d 1074, 1077 (9 th Cir.1983). Awaiting trial to decide jurisdiction should be the exception, not the rule.

The trial court should therefore approach the jurisdictional issue on a step-by-step basis. As noted in Part IV hereof, *infra* at p. 71, 751 *A.*2d at 557, some of the statements may not be capable of a defamatory meaning. (The statements may be part of a pattern of harassment condoned by the employer, but if not defamatory, the claims against individual defendants may be dismissed on that basis.) Concerning the defamation claims remaining, plaintiff should state with specificity the factual basis of her jurisdictional claims as we have outlined the law. The burden remains on plaintiff to allege or plead sufficient facts with respect to jurisdiction. "Once [ ] defendants have shown that they have no territorial presence in this state, the burden shifts, as it were, to [ ] plaintiff, who must then demonstrate their amenability, nonetheless, to an exercise of in personam jurisdiction based on minimum contacts." *Citibank, N.A. v. Estate of Simpson,* 290 *N.J.Super.* 519, 533, 676 *A.*2d 172 (App.Div.1996). In order to determine the factual basis for her claims, plaintiff should be permitted leave to take discovery of defendants by written interrogatories or by deposition at the residence of defendants unless a more convenient forum may be agreed upon. Following such discovery, the trial court will determine whether triable issues are presented concerning whether those who published defamatory statements did so with the knowledge or purpose of hindering plaintiff in the pursuit of her civil rights in New Jersey.

## IV.

Having put the threshold issues in a more modest perspective, it is our hope that the parties, with assistance of active case management at the trial level, will approach the substantive issues with a

similar outlook. Many of the messages complained of appear to us to be not capable of a defamatory meaning. Some of the messages appear to be expressions of opinion concerning the pending litigation, the truth of which simply cannot be assessed. *See Ward v. Zelikovsky*, 136 *N.J.* 516, 531, 643 *A.*2d 972 (1994)(holding that "[u]nless a statement explicitly or impliedly rests on false facts that damage the reputation of another, the alleged defamatory statement will not be actionable"). Some may be capable of a defamatory meaning in that they adversely reflect on plaintiff's fitness to conduct her profession, for example, that she destroyed company property.

The first step is to sort out those statements that cannot be regarded as harassing or defamatory. Concerning those that may be viewed as harassing, the court must determine if triable issues of fact are presented concerning whether (1) the Crew Members Forum was sufficiently integrated with Continental's operations so as to provide a benefit to it; (2) the employer had notice of the conduct; and (3) the conduct complained of was "severe or pervasive enough to make a ... reasonable [person] believe that ... the conditions of employment are altered and the working environment is hostile or abusive." *Lehmann v. Toys 'R' Us, supra,* 132 *N.J.* at 603–04, 626 *A.*2d 445. In addition, employers facing a retaliatory harassment claim may assert an affirmative defense based on their exercise of reasonable care to prevent and promptly correct any harassment. *Morris v. Oldham County Fiscal Court, supra,* 201 *F.*3d at 788–89. A demonstrated promptness to correct harassment on Continental's part may leave no triable issue of fact on its liability.

Concerning the messages that are capable of a defamatory meaning, assuming that jurisdiction may be found, the court should evaluate the claims to determine if the content is capable of a defamatory meaning in accordance with the principles of *Ward v. Zelikovsky, supra,* 136 *N.J.* 516, 643 *A.*2d 972.

Furthermore, we have consistently encouraged courts to dispose of cases in conformity with the standard set forth in *Brill v.*

*Guardian Life Insurance Co.,* 142 *N.J.* 520, 523, 666 *A.*2d 146 (1995). Under the *Brill* test the essential question is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Id.* at 533, 666 *A.*2d 146 (*quoting Anderson v. Liberty Lobby, Inc.,* 477 *U.S.* 242, 251–52, 106 *S.Ct.* 2505, 2512, 91 *L.Ed.*2d 202, 214 (1986)). Those principles apply with equal force in employment discrimination cases. *See Reynolds v. Palnut Co.,* 330 *N.J.Super.* 162, 170, 748 *A.*2d 1216 (App.Div.2000)(holding "evidence presented on the motion against plaintiff's position is so one-sided that plaintiff is unable to satisfy a rational fact finder with the legitimacy of his position"); *Svarnas v. AT & T Communications,* 326 *N.J.Super.* 59, 72, 740 *A.*2d 662 (App.Div.1999) ("[a]pplying the summary judgment standard, the judge held that the evidence was so 'one-sided' that defendants must prevail as a matter of law"); *Melick v. Oxford,* 294 *N.J.Super.* 386, 398, 683 *A.*2d 584 (App.Div.1996) (concluding that "[e]vidence was insufficient for a factfinder to conclude that defendants [took employment action] out of a desire to terminate [or] to retaliate against [employees]").

Finally, we would hope that an employer who cherishes its reputation for caring for its customers would use its good offices to resolve this long simmering disagreement among its key employees, whose harmony would appear crucial not only to efficient flight operations but to general public safety as well.

The judgment of the Appellate Division is reversed. The matter is remanded to the Law Division for further proceedings in accordance with this opinion. In view of our disposition, we do not consider the various motions filed by parties, the resolution of which should be left to the Law Division.

*For reversal and remandment*—Chief Justice PORITZ and Justices O'HERN, STEIN, COLEMAN, LONG, VERNIERO and LaVECCHIA—7.

*Opposed*—None.