791 A.2d 238 (2002)
348 N.J. Super. 1
Jennifer HERMAN and George E. Herman, III, Husband and Wife, Plaintiffs-Appellants,
v.
The COASTAL CORPORATION, a foreign corporation, Coastal Eagle Point Oil Company, A Subsidiary of the Coastal Corporation, Jack Lipinski, Rich Lowery, Bill Smith, Mark Anderson, Ernie Smith, James Soden and Mark Schools, Defendants Respondents,
and
James Soden and Mark Schools, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 2001.
Decided February 13, 2002.
*241 Clifford L. Van Syoc, Cherry Hill, argued the cause for appellants (Mr. Van Syoc, of counsel and on the brief).
Joseph F. Betley, Mt. Laurel, argued the cause for respondents (Capehart & Scatchard, attorneys; Mr. Betley, of counsel and on the brief).
Before Judges BAIME, NEWMAN and AXELRAD. *239
*240 The opinion of the Court was delivered by NEWMAN, J.A.D.
Plaintiff, Jennifer Herman, (references to plaintiff are to Jennifer Herman only) filed suit against her employer, Coastal Eagle Point Oil Company (CEPOC), a subsidiary of the Coastal Corporation (Coastal), the corporation itself, and several of the company's employees, Jack Lipinski, Rich Lowery, Bill Smith, Mark Anderson, Ernie Smith, James Soden, and Mark Schools, alleging sexual harassment and sexual discrimination against her based on marital status and pregnancy, breach of her employment agreement, and subsequent to the filing of the initial complaint, retaliation and a hostile work environment in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1-to-42. Her husband George filed a per quod claim for loss of consortium.
Plaintiffs' complaint was ultimately dismissed on summary judgment following the entry of a succession of orders which included: (1) Judge Little's April 14, 1997 order granting defendants' motion for summary judgment dismissing the husband's loss of consortium claim, plaintiff's claims of breach of her implied and express employment contract, discrimination against her based on marital status and pregnancy, and all claims against defendant Jim Soden, head operator and trainer of the Sulfulane Recovery Unit, who the judge concluded was not plaintiff's supervisor; the motion was denied as to Jack Lipinski, Plant Manager; (2) Judge Colalillo's September 26, 1997 order granting summary judgment as to Mark Schools, a coworker in the Sulfulane Recovery Unit; the motion denied was as to supervisor of operations, Ernie Smith, and the employee relations manager Bill Smith; (3) Judge Snyder's October 23, 1998 order granting the remaining defendants' motion for summary judgment dismissing plaintiff's entire second amended complaint alleging sexual *242 discrimination and sexual harassment and finding that plaintiff was not subject to a hostile work environment as claimed against her individual supervisors, Mark Anderson, Jack Lipinski, Ernie Smith, Bill Smith, and Rich Lowery, and alleging malicious breach of employment agreement by the employer; and (4) Judge Snyder's February 10, 1999 order denying reconsideration which requested vacation of all prior orders granting summary judgment.
On appeal, plaintiff raises the following arguments for our consideration:
I. THE TRIAL COURT ERRED IN FINDING THAT PLAINTIFF WAS NOT SUBJECT TO A HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE LAD.
II. THE LAW DIVISION ERRED IN GRANTING SUMMARY JUDGMENT TO THE INDIVIDUAL DEFENDANTS UNDER THE LAD.
III. THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF, GEORGE HERMAN'S CAUSE OF ACTION FOR LOSS OF CONSORTIUM BASED ON COMMON LAW CLAIMS.
After careful review of the entire record and in light of the applicable law, we are persuaded that the complaint was properly dismissed as to all defendants and affirm.

I.
Ordinarily, we would recapitulate the facts in a light most favorable to plaintiff, relying on the support for plaintiff's various statements in the record as cited in plaintiff's brief. We are unable to do so here because the citations to the record in plaintiff's brief do not support plaintiff's allegations. We have, therefore, summarized the facts in a light most favorable to plaintiffs, but on what the record actually supports.
Plaintiff was hired by Coastal on September 21, 1987, to work at CEPOC. On July 2, 1989, plaintiff married George Herman. At that time, both plaintiffs were employed by CEPOC in the Catalytic Reformer Unit (CRU). CEPOC's Employment of Relative Policy (Policy) prohibited the employment of relatives in the plant. As set forth in the Policy, if one employee marries another employee, the Policy requires that one employee be transferred to another division unless an exception is granted by the unit supervisor and Employee Relations. The choice of which employee should transfer is that of the employee. If a transfer cannot be effected, the choice of who is terminated remains with the employees.
Plaintiff first approached representatives of CEPOC regarding an exception to the Policy when she became pregnant in December 1989 and again in September 1990 after her baby was born. During these two initial discussions, plaintiff was advised that either she or her husband would have to leave pursuant to the Policy. Plaintiff again approached CEPOC regarding an exception to the Policy and in March 1991, CEPOC, under the impression that plaintiffs were not yet married, formally approved the exception that allowed plaintiffs to continue to be employed at the plant once they decided to marry. This exception was approved by Jack Lipinski, then Vice President of Refining, via a March 6, 1991 memorandum. However, they were still prohibited from working together in the same unit. Since plaintiff had previously been approved to fill a vacancy in the Poly/Cumene unit of the plant, plaintiffs decided she should transfer out of the CRU.
It is CEPOC's policy that when an employee transfers from one unit to another, *243 the employee is reduced one pay level and classification, until the employee gains training and experience in the new unit. In plaintiff's case, however, an exception was granted and she did not suffer any loss of pay due to her transfer from the CRU to the Poly/Cumene unit in March 1991.
In March 1992, plaintiff was transferred to the Sulfulane Recovery Unit ("SRU") from the Poly/Cumene unit. In late 1993, CEPOC realigned the CRU and SRU under one supervisor. Since this would mean that once again plaintiffs would be in violation of the Policy which prohibited related employees from reporting to the same supervisor, Bill Smith, Employee Relations Manager, obtained a second exception to the Policy on behalf of plaintiffs. The exception was formally approved on January 3, 1994 by Mark Anderson, Plant Manager, by way of inter-corporate correspondence to Jack Lipinski.
The SRU and CRU were subsequently combined into one single operating unit. Bill Smith procured a third exception to the Policy for plaintiffs, allowing them to work together on the new CRU-SRU combined unit.
In December 1989, when plaintiff learned she was pregnant, she requested a transfer out of the CRU as an operator because she did not want to be exposed to the chemicals used in the unit. She was initially offered two options: (1) a position as a receptionist answering phones at half her usual pay; or (2) long term disability. Plaintiff complained that she was being discriminated against due to her pregnancy. Accordingly, Jack Lipinski agreed to allow plaintiff to assume the receptionist position at her normal operator salary during her pregnancy. He also assured plaintiff that she would have her old job back in the CRU upon her return from her pregnancy. To prevent a morale problem, Jack Lipinski requested that plaintiff not inform the other receptionists that she was still receiving her operator's salary.
Plaintiff claims that Lipinski "would take severe disciplinary action against her if she ever revealed to anyone the agreement by which her pregnancy disability was accommodated, which upset plaintiff to the point that she was spot bleeding, and perceived the health of her baby as being jeopardized." However, in her deposition she refers to a conversation with another individual as causing spot bleeding. There is nothing in the record to substantiate the allegation of a causal connection between any possible medical complications related to plaintiff's pregnancy and efforts of CEPOC to accommodate her pregnancy.
Upon her return to work after the birth of her child, plaintiff resumed her position as an operator on the SRU. A memorandum dated October 15, 1990, indicates that plaintiff was administratively eligible for a rate increase effective November 11, 1990. After receiving two weeks of refresher training, plaintiff's pay was increased. Plaintiff also was required to undergo additional training before being transferred to the Poly/Cumene Unit in May 1991.
On one occasion, while working in the Poly/Cumene unit in 1991, plaintiff alleges that Rich Lowery laughed at her and made reference to her "big butt" in response to the plant doctor telling plaintiff that she was getting skinny. At the time, plaintiff did not complain to anyone about the comment. There is no indication in the record that she told Lowery that she was offended or to stop making such remarks.
She also attributes an incident that occurred on February 3, 1992, as a form of sex discrimination. On that date, plaintiff was required to climb a 130-foot tower and cross a narrow bridge to open a relief *244 valve. Plaintiff's husband, George, assisted her in this task. This caused Lowery to laugh at her in front of other co-workers, which was reported back to plaintiff by Michelle Geist. Lowery contended that he was laughing at the situation because plaintiff was an experienced operator who should not have required assistance. George Herman confronted Lowery the next day. Ernie Smith, the Operation's Manager, then became involved and according to plaintiff, a meeting occurred between plaintiff's husband, Rich Lowery and Ernie Smith, at the end of which, her husband and Rich Lowery shook hands and promised to work together in the future. Plaintiff asserts that one month later, a memo authored by Bill Smith, Ernie Smith and Lowery "which sought to distort plaintiff's performance and to put her in the worst possible light" was clandestinely placed in plaintiff's personnel file. However, there is no documentation that such a memo ever existed. The only memo produced was authored shortly after the incident by Bill Smith, documenting the incident and addressed counseling provided to plaintiff's husband. No mention of disciplinary action regarding plaintiff is made in that memo.
Judge Snyder determined that the proofs offered by plaintiff did not support her allegation that the two incidents involving Rich Lowery amounted to sexual discrimination. Judge Snyder also rejected the inference offered by plaintiff's counsel that because plaintiff had just been through a pregnancy, the comment made by Lowery about her weight automatically turned the remark to a gender specific insult.
In February 1992, plaintiff was transferred from the Poly/Cumene Unit to the SRU after successfully bidding for a permanent position in that department. A coworker, Mike Bowman, also bid for that position, but instead secured the position known as a "breaker" or "VSOR" (Vacation, Sick, Overtime Relief) position which fluctuated between the SRU and the Waste Water Treatment Plant. Plaintiff became aware of rumors in the plant that there were more qualified people who bid on the SRU position that were passed over in favor of her. Bowman apparently did tell plaintiff that he felt he was more qualified for the position due to his service and credentials. Plaintiff complained about Bowman's statement to Bob Missonis, SRU supervisor, who told her not to worry about it since she got the preferred position. Plaintiff then complained to Bill Smith about Bowman's comment.
Plaintiff also asserted that Bowman would not let her borrow a reference book on boiler operations that Bowman had purchased to study for the boiler license test. Bowman had bought the book with his own funds and his policy was not to lend personal items out to anyone. Plaintiff also contended that coworkers helped males such as Bowman study for the Black Seal license test and would not help her. Plaintiff did not articulate any policy, practice, or requirement that Bowman lend her his own reference book to use for the Black Seal license test, or that other operators help her study for the test. In any event, plaintiff passed her boiler license test, and thus no adverse action took place.
Plaintiff was required to undergo training on the SRU unit, and trainers were supposed to sign off on her qualification sheet as she became competent in each area. Plaintiff asserts that no one would sign off on her qualification sheet. Plaintiff also asserts that there was "no contemporaneous documentation whatsoever that would corroborate any claim by William Smith that he in fact investigated or made any effort to remediate and repudiate the misconduct." Bob Missonis testified that *245 at a meeting with Bill Smith, he was told to speak to Jim Soden regarding signing off on the sheets. Plaintiff asserts in her brief that Michelle Geist eventually signed off on her qualification sheet, but her deposition testimony reveals that Michelle Geist merely changed some headings on the qualification sheet. Plaintiff then goes on to say that Frank Wolf actually trained her and implies that Wolf signed off after Geist changed the headings on the qualification sheet to allow Wolf to sign off for her.
Plaintiff also alleges that Jim Soden said that he would get "Alzheimer's Disease" when it came time to train her, as if to indicate that he had a general animosity towards her as a woman, but plaintiff states that Soden made the comment because he wanted the "A shift position" that she was also seeking. She states that Soden said, "If he didn't get A shift, he would get Alzheimer's disease when it came time to train me...." This is corroborated by Soden's testimony where he agrees he made the comment but states that he made it during a heated argument regarding the opening on the A shift. Both plaintiff and Soden wanted the shift for personal reasons, but plaintiff accused Soden of wanting the shift to keep it from her. Soden denied that it was his motivation for wanting the shift but admits making the statement. Plaintiff also asserts that Jeff Gregoris told her that "someone would have to put a gun to his head for him to `sign off' for her." However, the record indicates that plaintiff said that Michelle Geist told plaintiff that Jeff Gregoris said that.
Plaintiff then asserts that during a 1993 blizzard, plaintiff sought assistance from the night foreman, John Weber, who refused to help her "despite the undisputed custom and practice for night foremen to help male persons in plaintiff's position." Plaintiff presents no evidence of any custom or practice of night foremen helping male employees.
The record presented to Judge Snyder showed the following: On Saturday, March 13, 1993, blizzard conditions were present in the entire plant. At some point in time during the blizzard, the boiler feed water line in the SRU became frozen, thus shutting down the unit. Plaintiff alleges that she called John Weber several times that evening during which she complained of having wet clothes and that he did not come to the unit to help her. In her deposition, plaintiff states that Weber said he was too busy to go there personally, he made suggestions over the phone and that he sent Soden over at 2:00 a.m. Plaintiff also claims that Soden told her that Weber called her a "crybaby" regarding her wet clothes when he called Soden in to assist plaintiff. When asked if she considered it a sexist remark, plaintiff first answered yes, but then said, "I guess anybody could, not sexist, you're right, I didn't consider it (that a male can be a cry baby), like I consider it derogatory and demeaning and I don't think I needed to hear it." Plaintiff contends that she told Bill Smith about Weber's treatment of her and he did nothing, but her testimony is that she does not recall whether he got back to her or not.
Plaintiff then asserts that she was forced to requalify for her position and that no male employees ever had to do so. However, in her deposition, plaintiff conceded that all other operators have had to undergo requalification since then.
Mark Schools, a head operator on the SRU, was assigned to be the temporary supervisor of the SRU for six weeks beginning June 1999. Most of plaintiff's complaints centered on the personality conflicts and breakdown in communication between plaintiff and Schools. Plaintiff alleges that Schools "admitted" he had a *246 problem with her because she was female, that management forced her to work with him and that Schools threatened to fire her on numerous occasions. None of this is supported by the record. A meeting did occur regarding personality conflicts between the two parties. Schools complained that plaintiff did not follow his instructions and openly defied his authority. Bill Smith stated that Schools had a rigid management style and was like that with everyone, not just plaintiff. Plaintiff also alleges that Schools wrote knowingly false material in a log book about her, but in her deposition states that the information was true, but she felt he wrote it down in order to embarrass her. Plaintiff also complains that Schools would not help her during a plant wide emergency, but the record indicates that Al Kressley convinced Schools to talk to her regarding the reactor problem.
Plaintiff asserts that she was told that Schools was demoted because of his conduct towards her, but the testimony of Mark Anderson indicates, "[I]t would not be accurate to say that that was not considered. It was not the basis for the decision." Plaintiff complains that she was forced to work with Schools once he was removed from his supervisory position, but the record indicates that they worked on different shifts and occasionally relieved each other. Additionally, regarding Schools, plaintiff states "Schools admitted he had the power before his demotion to make decisions without checking with anyone else, as though he were a permanent supervisor." In fact, Schools states "Well, to make myself clear, as a temporary supervisor, as a temporary night foreman, I did not have the authority that a regular supervisor would have. My supervision was by direction. I made no decisions. I administered no discipline. I did not hire and fire...." Finally, plaintiff asserts that nothing was done to address her complaints about Schools, while the record indicates that meetings were held regarding the conflicts between Schools and plaintiff and ultimately Schools was relieved of his supervisory duties due to his rigid management style.
Plaintiff then mentions several "alarming" incidents which occurred at the beginning of her tenure with CEPOC, but implies they occurred during the time period in question. They include an incident involving a female hygiene product, an altered Christmas card and the "fucking cunt" comment by John Wright[1]. Since the incidents actually occurred before the complained of time frame, management was not properly informed at the time of the occurrences, and additionally, the details of which are misrepresented by the plaintiff, they will not be further addressed. Significantly, plaintiff was interviewed by Bill Smith in January 1992 and when asked whether she had experienced sex discrimination during her employment with CEPOC, plaintiff replied, "No."
Plaintiff alleges that she was subject to unwanted sexual advances by Charles Stettler. Plaintiff also states in her deposition that she and Stettler occasionally went out socially at the time she was dating her husband. She alleges that Stettler picked her up and placed her on a desk and that he pinned her against a wall and mashed himself against her on August 31, *247 1993. She states that he threatened to kidnap her and take her to the Caribbean. However, in her deposition, plaintiff says that Stettler would joke about taking her to Aruba when they took smoking breaks together. There is no documentation in the record of plaintiff saying anything to management about any of these incidents. She did not complain to Bill Smith and there is no mention of Stettler in the OFCCP complaint. Stettler, in fact, was named as a friendly witness in discovery, and her answers to interrogatories listed Stettler only in terms of knowledge regarding the actions of Schools and Soden. As to the graphic comment plaintiff attributes to Stettler, in her deposition, plaintiff testifies that she overheard the comment when Stettler was talking with two other men, not during any conversation between the parties regarding his sex life.
Plaintiff then makes reference to the sexually inappropriate comment by co-worker, Bill Sahms, in 1997, without further elaboration. Bill Sahms is also not named in the complaint. Plaintiff first raised the allegation without naming the individual. Plaintiff's counsel subsequently advised Coastal's attorney of the identity of the party. Prior to this identification, Joe Sullivan, Operations Manager and Donna Birosak, Employee Relations Manager, began an investigation and spoke to all persons mentioned by plaintiff who were present on the unit when the inappropriate comments were purportedly made. During his meeting with Joe Sullivan, Sahms admitted making comments about plaintiff's nipples and air conditioning, but stated he thought it was a long-running, mutual joke between him and plaintiff and a comment made in jest between two friends. Management determined that the comments were not appropriate and reprimanded Sahms. In her deposition on June 30, 1998, plaintiff stated that she was "absolutely" satisfied with management's handling of the "Sahms" incident.
Regarding the allegations of obscene drawings that "were permitted by CEPOC to persist in the bathroom and all over the plant," the record developed is diametrically opposed to plaintiff's statement of facts. Plaintiff could not name one instance where CEPOC management became aware of inappropriate drawings or pictures in the plant and nothing was done to remedy the situation.
As to the crude drawing in the bathroom of one of the operations units, the issue was first raised by plaintiff during the deposition of Ernie Smith. Plaintiff's attorneys informed Smith during questioning that there was a crude drawing of a naked woman on the inside door of the bathroom stall in the CRU. Management immediately painted over the drawing. Additionally, instead of informing management of another drawing she had seen, she asked for a can of paint, painted over it herself and then told her attorneys about it. When questioned if something was done whenever management was told about a drawing, plaintiff replied "Oh, my gosh, yes. They ran to the plant, took pictures and painted over it."

II.
On appeal, plaintiffs allege that the motion judge erred in granting defendants' motion for summary judgment, erroneously concluding that plaintiff had not been subject to a hostile work environment. Plaintiff asserts that the motion judge's inability to find "any reasonable basis for alleged discrimination based upon gender" was an erroneous finding and that the motion judge failed to consider the totality of the circumstances and instead required plaintiff to present a "landmark" in support of her claim.
*248 The standard for determining employer liability for sexual harassment under the LAD is set forth in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 626 A.2d 445 (1993). There are two categories of sexual harassment: (1) Quid pro quo, where "an employer attempts to make an employee's submission to sexual demands a condition of his or her employment;" and (2) Hostile work environment, "when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." Id. at 601, 626 A.2d 445. Plaintiff's claims against CEPOC fall under the hostile work environment strand of sexual harassment.
Because these claims were dismissed on summary judgment, the evidence before the trial court is evaluated on appeal using the standard established in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). In determining a motion for summary judgment, the judge must decide whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party." Ibid.
This court must apply the same standards as a trial court in determining whether the grant or denial of summary judgment was proper. Critically, summary judgment must not be granted where a genuine issue of material fact exists. R. 4:46-2; Brill, supra, 142 N.J. at 530, 666 A.2d 146. Although bare conclusions in the pleadings will not defeat a meritorious application for summary judgment, all papers on file, including affidavits and the complaint, should be considered. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75, 110 A.2d 24 (1954).
Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Disputed issues that are "`of an insubstantial nature' " cannot overcome a motion for summary judgment. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 530, 666 A.2d 146 (1995) (citation omitted). "[W]hen the evidence `is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." Id. at 540, 666 A.2d 146 (internal citation omitted).
Here, Judge Snyder reviewed the substantial record developed by the parties and after examining the various incidents and events that plaintiffs portrayed as creating a sexually hostile work environment from the "totality of circumstances" viewpoint, correctly determined that plaintiffs did not present sufficient competent evidence to establish a cause of action for hostile work environment sexual harassment under Lehmann. Judge Snyder rather recognized plaintiffs' assertions of sexual harassment as being supported by the subjective "feelings" of plaintiff. "She does have a continuing course of problems with her employer ... [b]ut she never seems to be able to point her finger to anything specifically indicating that she was discriminated against based on gender."
As an initial matter, the allegations of unfair treatment due to the Employment of Relatives Policy, and the circumstances surrounding plaintiff's pregnancy, are lacking in proof of discriminatory motivation. Judge Little correctly rejected the marital status claim, and the pregnancy discrimination theory is likewise meritless. There *249 is simply no evidence of conduct or adverse employment actions taken against plaintiff based on her gender. Indeed, the record conclusively established that plaintiff received preferential treatment during her first four years at CEPOC, even when she and her husband kept the company in the dark regarding their marriage in order to preserve their jobs.
The fountainhead of the legal analysis in a hostile work environment claim is set forth in Lehmann. To state a claim for hostile work environment sexual harassment, the plaintiff must establish: "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Lehmann, supra, 132 N.J. at 603-04, 626 A.2d 445.
Judge Snyder determined that plaintiff's proofs did not even meet the initial threshold, that the conduct occurred because of plaintiff's sex. The Lehmann Court stated:
The first element of the test is discrete from the others. It simply requires that in order to state a claim under the LAD, a plaintiff must show by a preponderance of the evidence that she suffered discrimination because of her sex. Common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex. For example, if a supervisor is equally crude and vulgar to all employees, regardless of their sex, no basis exists for a sex harassment claim. Although the supervisor may not be a nice person, he is not abusing a plaintiff because of her sex.
[132 N.J. at 604, 626 A.2d 445.]
The defining element in hostile work environment cases is not that the conduct was sexual in nature, but that the harassment occurs because of the employee's gender. Id. at 602, 626 A.2d 445. Accordingly, plaintiff's entire case against Mark Schools was rejected by Judge Colalillo in language strikingly similar to Lehmann. Judge Colalillo found that, "He [Schools] may not be friendly, he may not be nice, they may not get along ...," but there was no competent evidence of hostility based on sex. Similarly, after an exhaustive investigation the supervisory ranks at CEPOC came to the same conclusion: Schools and plaintiff mutually suffered a complete breakdown in communication due to personality conflict. It should be noted also that this mutual lack of communication resulted in School's downfall, not plaintiff's. Personality conflicts, albeit severe, do not equate to hostile work environment claims simply because the conflict is between a male and female employee. Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F.Supp. 614, 617 (D.N.J.1998). There was no competent evidence that Schools' conduct toward plaintiff, and the mutual animosity between the two, was gender motivated.
In addition, Judge Snyder dismissed the claims asserted against Rich Lowery arising from the "big butt" comment as lacking any showing of being gender-based. While the remark may be construed as insensitive, Judge Snyder correctly determined that there was no proof that Lowery's actions "more likely than not occurred because of plaintiff's sex." Lehmann, supra, 132 N.J. at 605, 626 A. 2d 445. Similarly, there is nothing in the record to support that the tower climbing incident during which Lowery laughed to a coworker that plaintiff, an experienced operator, needed her husband's assistance to do her job, could be *250 construed as sexual harassment. As stated in Heitzman v. Monmouth County, 321 N.J.Super. 133, 147, 728 A.2d 297 (App. Div.1999):
[A] hostile work environment discrimination claim cannot be established by epithets or comments which are `merely offensive.' An employment discrimination law such as the LAD is not intended to be a "general civility code" for conduct in the workplace ... Discourtesy or rudeness should not be confused with racial or ethnic harassment, and a "lack of racial or ethnic sensitivity" does not, alone, amount to actionable harassment. Thus, "simple teasing," offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "terms and conditions" on employment.
As to the other allegations made by plaintiff, the refresher training ordered in July 1993 was applicable to all SRU operators; plaintiff was merely the first to be retrained. As plaintiff concedes, all other operators subsequently underwent the same retraining.
The "blizzard incident" also lacked any basis to posit a claim of gender discrimination. There a second hand comment made by Weber to Soden that plaintiff was being a "crybaby" during the blizzard, demanding that Weber ignore the emergency conditions of the entire plant to address her needs for dry clothes, cannot be considered gender based. Mere insults in the workplace are not the equivalent of discrimination. See Taylor v. Metzger, 152 N.J. 490, 510-11, 706 A.2d 685 (1998)(comparing racial insults to such statements as "You are a God Damned woman and a God damned liar," which the Restatement gives as an example of a "mere insult."). The comment was not even made directly to plaintiff, and plaintiff herself admitted the comment was not sexist in nature, since males who complain more often about work-related conditions to other employees and supervisors are commonly called "crybabies." If the alleged form of harassment is not sexual in nature, plaintiff must show that the harassment occurred because of her sex. Lehmann, supra, 132 N.J. at 605, 626 A.2d 445. Additionally, it would be absurd to suggest that an offhand comment by a night foremen to another employee describing plaintiff as a "crybaby," under circumstances where the description was arguably on point, constitutes evidence of sexual harassment.
We next consider Mike Bowman's expression of his opinion that he felt he was more qualified for the position that plaintiff received and Jim Soden's comment about getting "Alzheimer's Disease" when it came time to train plaintiff. There is nothing in the LAD that prevents a coworker from expressing an opinion about his belief in his capabilities to another coworker and his disappointment in losing out on a coveted position within an organization. Likewise, Jim Soden's comment about getting "Alzheimer's disease" is similarly innocent of discriminatory intent or even animus. Soden was applying for the same shift change as plaintiff and was expressing his opinion in a heated discussion over who deserved the shift more. Plaintiff's suggestion to Soden that he was motivated, not by a desire to spend more time with his family, but due to a penchant to deprive plaintiff of the shift change, was nothing more than competitive exchanges, devoid of any gender bias.
Plaintiff's attempt to include the alleged incidents between herself and Charlie Stettler and Bill Sahms as examples of hostile work environment are also rejected. The occurrences purportedly involving Stettler were never reported to management and any reference to Stettler in previous filings had only been as a friendly *251 witness to other occurrences within the plant. The "Sahms incident" was fully investigated by CEPOC, and plaintiff is on the record as being completely satisfied with the outcome of the investigation and management's handling of the incident.
Finally, plaintiff's allegations that CEPOC allowed obscene drawings and pictures to remain all over the plant are without merit. Plaintiff herself admitted that once notified, management immediately painted over such pictures or drawings. Management cannot be cited as ineffective when they are not even apprised of the drawings plaintiff may have seen, as when she asked for paint to cover a drawing without informing management of the reason.
In conclusion, while a claim for a hostile work environment must consider the totality of the circumstances, the complained of conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Lehmann, supra, 132 N.J. at 608, 626 A.2d 445. Plaintiff's attempt to lump random incidents and disagreements with co-workers during her tenure at CEPOC are ineffective in meeting the standard of "an abusive working environment." As stated by the District Court of New Jersey, "Although a person is legally entitled to a work environment free of hostility, she is not entitled to a perfect workplace, free of annoyances and colleagues she finds disagreeable. In short, what is illegal is a `hostile work environment,' not an `annoying work environment.'" Lynch v. New Deal Delivery Serv., Inc., 974 F.Supp. 441, 452 (D.N.J.1997). Summary judgment was properly granted, dismissing plaintiff's claims of a hostile working environment.

III.
Plaintiffs challenge the various rulings dismissing the individual defendants without detailing the legal theories applicable to each defendant. Plaintiffs essentially reargue the Lehmann standard to spell out that plaintiffs espouse individual liability against the individual Coastal defendants based on the "aiding and abetting" theory set forth in N.J.S.A. 10:5-12e, rather than direct liability as "employers" under N.J.S.A. 10:5-12a. No matter what test for individual liability is applied, there was insufficient evidence in the record for individual liability against any defendant.
N.J.S.A. 10:5-12a prohibits unlawful employment practices or unlawful discrimination only by "an employer." An individual supervisor is not defined as an "employer" under the LAD. N.J.S.A. 10:5-5e. However, N.J.S.A. 10:5-12e deems it unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." To "aid" means "to assist, support or supplement the efforts of another," and to "abet" means "to encourage, counsel, incite or instigate." Baliko v. Stecker, 275 N.J.Super. 182, 191, 645 A.2d 1218 (App.Div. 1994), (citing State v. Newell, 152 N.J.Super. 460, 469, 378 A.2d 47 (App.Div.1977) and several civil cases).
There can be no employer liability for sexual harassment in the absence of a showing that the harassing employee was acting within the scope of his employment, or that the employer was negligent, or had intended the conduct. Lehmann, supra, 132 N.J. at 619-21, 626 A.2d 445. A severe or pervasive harassment in a work-related setting that continues a pattern of harassment on the job is sufficiently related to the workplace that an informed employer who takes no effective measures to stop it, "sends the harassed *252 employee the message that the harassment is acceptable and that the management supports the harasser." Blakey v. Continental Airlines, Inc., 164 N.J. 38, 59, 751 A.2d 538 (2000) (quoting Lehmann, supra, 132 N.J. at 623, 626 A.2d 445). "[E]mployers do not have a duty to monitor private communications of their employees; employers do have a duty to take effective measures to stop co-employee harassment when the employer knows or has reason to know that such harassment is part of a pattern of harassment that is taking place in the workplace and in settings that are related to the workplace." Id. at 62, 751 A.2d 538. "[W]hen a coworker engages in harassing conduct, an employer is liable only if `management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment.'" Heitzman, supra, 321 N.J.Super. at 146, 728 A.2d 297 (quoting Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421 (7th Cir.1986)).
An employer's liability for sexual harassment is predicated on the harassing employee's supervisory status and his consequential status as the employer's agent, Lehmann, supra, 132 N.J. at 618-19, 626 A.2d 445, or if supervisors knew or should have known of the harassment campaign and allowed it to continue. Heitzman, supra, 321 N.J.Super. at 146, 728 A.2d 297. See also Hunter, supra, 797 F.2d at 1421. Vicarious liability for sexual harassment may be established where the employer delegated authority to the supervisor to control the situation of which the plaintiff complained; the supervisor's exercise of that authority resulted in a violation of the LAD; and the delegated authority aided the supervisor in injuring the plaintiff. Lehmann, supra, 132 N.J. at 620, 626 A.2d 445.
A supervisor has a unique role in shaping the work environment. Part of a supervisor's responsibilities is the duty to prevent, avoid, and rectify invidious harassment in the workplace. See Lehmann, supra, 132 N.J. at 622-23, 626 A.2d 445 (holding an employer was vicariously liable for sexual harassment if it had knowledge of the harassment but failed to stop it promptly and effectively). An employer has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs. Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 537, 691 A.2d 321 (1997) (holding that an employer's remedial response to complaints of harassment is relevant to an employee's discrimination claim); Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir.1995) (imposing liability for employer's failure to take prompt action calculated to end ethnic harassment after becoming aware of it); Ellison v. Brady, 924 F.2d 872, 882 (9th Cir.1991) (requiring an employer to end sexual harassment); Davis v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir.1988) (shielding an employer from liability because it "took quick and appropriate measures to remedy the situation"), cert. denied, 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989); Peter M. Panken et al., Sexual Harassment in the Workplace: Employer Liability for the Sins of the Wicked, SB36 A.L.I.-A.B.A. 203, 228 (1997) (recognizing employers lessen liability by having an effective and responsive complaint procedure).
Our highest State court has not yet addressed individual liability under LAD. For this reason, we have relied upon federal case law in this area. Even in the federal arena, there is a lack of unanimity on the applicable test. In Shepherd v. Hunterdon Developmental Ctr., 336 N.J.Super. 395, 424, 765 A.2d 217 (App. Div.2001), Judge Lefelt described the *253 struggle within federal courts in New Jersey to define the meaning of "aiding and abetting" under the LAD. He explained that three tests for employee liability under N.J.S.A. 10:5-12e have developed.
In Tyson v. CIGNA Corp., 918 F.Supp. 836 (D.N.J.1996), aff'd, 149 F.3d 1165 (3d Cir.1998), the court noted that N.J.S.A. 10:5-12e adds accomplice liability to the statute. When read in conjunction with N.J.S.A. 10:5-12a, it forbids any person to aid or abet an employer's discriminatory conduct. Id. at 840. To aid or abet, the individual must willfully and knowingly associate himself or herself with the unlawful act, and seek to help make the act succeed. The defendant must share the same intent as the one who actually committed the offense. Ibid.

According to Tyson, a supervisor who engages in discriminatory conduct, while acting within the scope of employment, shares the intent of his or her employer and may thus be held individually liable as an accomplice. Ibid. However, this is not true when the supervisor acts outside the scope of employment because the employer in that situation is liable for the conduct only insofar as it fails to adequately respond to it. Id. at 841, 842 n. 10. Moreover, in order to find a supervisor individually liable, he or she must affirmatively engage in discriminatory conduct. Mere inaction, passivity or acquiescence do not suffice. Id. at 841.
The Third Circuit, in reviewing Hurley v. Atlantic City Police Dep't, 933 F.Supp. 396 (D.N.J.1996), aff'd, 174 F.3d 95 (3d Cir.1999), followed Failla v. City of Passaic, 146 F.3d 149 (3d Cir.1998). In Failla, the court rejected Tyson's view that individual liability under N.J.S.A. 10:5-12e was based on the concept of "shared intent" and found it irrelevant whether a supervisor had acted within the scope of employment. 146 F.3d at 156-57. The Third Circuit concluded that an employee aids or abets a LAD violation when he or she knowingly gives substantial assistance or encouragement to the unlawful conduct of the employer. Id. at 157-58 (relying on Restatement (Second) of Torts § 876(b) (1979) to define aiding and abetting liability); accord Hurley, supra, 174 F.3d at 126. Under this test, employees are not liable as aiders or abettors merely if they have some role, knowledge, or involvement in the illegal conduct. The standard is set above mere knowledge or implementation "lest a reverse respondeat superior liability ... be created under the guise of aiding and abetting." Failla, supra, 146 F.3d at 159.
In Jones v. Jersey City Med. Ctr., 20 F.Supp.2d 770, 774 (D.N.J.1998), the district court established a liability standard gleaned from both Tyson and Failla. Here, the court concluded that to be individually liable under the LAD, a person must intend to facilitate discrimination, must share a community of discriminatory purpose with the actual perpetrator, must be a supervisor, and must engage in affirmative acts of discrimination within the scope of employment. In addition, the individual must know of the principal's discriminatory conduct, must know that such conduct involves a breach of duty, and must actually assist or encourage the unlawful act. Id. at 774-75.
[Id. at 424-26, 765 A.2d 217.]
In Shepherd, this court did not decide the appropriate test for assessing aiding and abetting liability since we concluded that summary judgment was improvidently granted where, under either the Tyson and Jones test, a fact-finder could find that defendants were promoting the interests *254 of their employer when they chastised plaintiffs or under the Failla/Hurley test, a fact-finder could find that defendants gave substantial encouragement to the unlawful conduct of their employer. Id. at 426, 765 A.2d 217.
In addition to determining whether the employee can be held individually liable for his acts of sexual discrimination and harassment, that individual to be liable would have to hold a position of supervisor. In Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 123, 735 A.2d 548 (1999), the Supreme Court examined who constitutes "upper management" under Lehmann. The Court held that "functional assignments are immediately relevant in determining who is a supervisor for purposes of vicarious liability for compensatory damages." Id. at 124, 735 A.2d 548. The Court explained that "a mere title of `manager' or `supervisor' does not by itself suffice to impute that employee's knowledge or actions to the employer." Id. at 123, 735 A.2d 548. Generally, a supervisor has the authority to hire, fire, discipline, control employees' wages or control employees' schedules. Id. at 124, 735 A.2d 548. This court has held that "[a]n employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor `to control the day-to-day working environment' facilitates harassing conduct." Heitzman, supra, 321 N.J.Super. at 145, 728 A.2d 297 (citing Lehmann, supra, 132 N.J. at 620, 626 A.2d 445). However, "when a coworker engages in harassing conduct, the employer is only liable if `management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment.' " Heitzman, supra, 321 N.J.Super. at 146, 728 A.2d 297 (citing Hunter, supra, 797 F.2d at 1421). Most importantly, a supervisor cannot be held individually liable for discrimination pursuant to the LAD, where there was no indication that the employee's claim was predicated upon a theory of aiding and abetting, which can support a finding of individual liability. Kennedy v. Chubb Group of Ins. Cos., 60 F.Supp.2d 384 (D.N.J.1999).
Plaintiffs do not challenge the dismissal of Jim Soden as an individual defendant. Soden was not a supervisor, and thus there is no individual liability under the LAD.
Mark Schools, as a temporary supervisor of the SRU, had insufficient supervisory authority over plaintiff to trigger supervisory liability. Schools had no power to hire, fire, impose discipline, conduct evaluations, or set other terms and conditions of employment. He merely directed the technical aspects of the SRU.
No evidence was presented that any supervisory employee actively engaged in discriminatory conduct, gave substantial assistance to or encouragement in maintaining a hostile work environment, or was deliberately indifferent to the complaints of plaintiff. The record abounds with managerial responses to the concerns of plaintiff. Plaintiff's complaints regarding her pregnancy and chemicals in the workplace were not only addressed to her satisfaction but also preferential treatment was afforded. Four separate exceptions were granted in plaintiff's favor regarding the policy prohibiting relatives from working together. The tower climbing incident was investigated in detail by several management personnel. The dispute over who would sign the qualification sheets was quickly resolved in plaintiff's favor through the efforts of Bill Smith. The confrontation with Mark Schools was addressed with face-to-face meetings and efforts to conciliate between Schools and plaintiff. Her concerns over Schools coming back to the SRU was also met with management's overview of the relief and several meetings *255 with Bill Smith. Schools' prospects of becoming a permanent supervisor suffered based on Coastal management's evaluation of his inflexible dealings with plaintiff throughout the entire episode.
Plaintiff's feelings of being singled out for refresher training generated a personal response from Ernie Smith, as well as personal meetings by Ernie Smith with every member of the SRU. Finding the sexual drawing in the bathroom prompted immediate remedial measures, even though plaintiff raised the issue at a deposition, rather than simply informing the head operator and supervisor. Sahms' comment was immediately investigated and remedial action taken to plaintiff's complete satisfaction.
The company's policy against sexual harassment was publicized and distributed to every employee, and reaffirmed every year by Employee Relations through memos and workshops. Ernie Smith took further steps to remind the employees on the SRU regarding the company's position against sexual harassment. Bill Smith, upon his hiring as Employee Relations Manager, interviewed every female employee in the plant regarding sexual harassment. He actively encouraged plaintiff to come forward with any complaints of harassment. In a word, his door was always open to plaintiff and she took full advantage of it. Contrary to plaintiff's bald assertions, there is a wealth of evidence that plaintiff's concerns were actively investigated and appropriate action taken. On this record, it does not matter which test of superior liability is applied, there is no basis to support the bare allegations of gender based discrimination and, most significantly that the supervisors did not respond to plaintiff's complaints.

IV.
Plaintiff asserts that the trial court erred in dismissing plaintiff's husband's cause of action for loss of consortium. Plaintiff maintains that a plaintiff may recover for loss of consortium when the injury has been to the spouse's mental or emotional health. Plaintiff alleges that defendants caused plaintiff emotional distress regarding her marriage to her husband and that she lived in constant fear of losing her job due to CEPOC's company's anti-nepotism policy. Additionally, plaintiff alleges that the constant harassment she endured also contributed to her well being, and as a result, plaintiff asserts that her husband suffered as well.
Plaintiff's husband cannot maintain a claim for loss of consortium because such a claim based on the LAD is not recognized in this State. See Catalane v. Gilian Instrument Corp., 271 N.J.Super. 476, 500, 638 A.2d 1341 (App.Div.) ("Our reading of the LAD satisfies us that the Legislature did not intend to establish a cause of action for any person other than the individual against whom the discrimination was directed. See N.J.S.A. 10:5-3. If per quod claims were to be allowed under the Act, the Legislature would have so noted in light of its careful recitation of the damages it intended to allow."), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994).
Affirmed.
NOTES
[1] This occurred in 1987. During a heated exchange (or a "tiff" according to the plaintiff) John Wright called plaintiff a "fucking cunt." Lee Thorn, Operations Manager, conducted an investigation but plaintiff would not name Wright because she did not want to "get him in trouble." Nevertheless, plaintiff, while not including the incident in her complaint, mentions it in her brief to suggest it was concurrent to the time frame of her complaint and not addressed by management.