**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1886-17T4

MARRISA TAYLOR-MUNGER,

     Plaintiff-Appellant,

v.

COUNTY OF UNION, UNION
COUNTY DEPARTMENT OF
CORRECTIONAL SERVICES,
KEVIN BURKERT, individually
and in his official capacity, and
BRIAN RIORDAN, individually
and in his official capacity,

     Defendants-Respondents.

_____

Argued December 20, 2018 – Decided July 15, 2019

Before Judges Simonelli, Whipple and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2708-15.

Tiana Gimbrone argued the cause for appellant (Rinaldo and Rinaldo, attorneys; Matthew T. Rinaldo and Tiana Gimbrone, on the brief).

Steven H. Merman, Assistant County Counsel, argued the cause for respondents County of Union and Union County Department of Correctional Services (Robert E. Barry, Union County Counsel, attorney; Steven H. Merman, on the brief).

Michael S. Simitz argued the cause for respondent Kevin Burkert (Kologi Simitz, attorneys; Michael S. Simitz, of counsel and on the brief).

Christina M. DiPalo argued the cause for respondent Brian Riordan (LaCorte, Bundy, Varady & Kinsella, attorneys; Robert F. Varady and Christina M. DiPalo, on the brief).

PER CURIAM

Plaintiff Marrisa Taylor-Munger appeals from three November 17, 2017 orders of the Law Division collectively granting summary judgment to defendants Union County, Kevin Burkert, and Brian Riordan, and dismissing plaintiff's claims under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. The trial court found plaintiff's claims were barred by the two-year statute of limitations, N.J.S.A. 2A:14-2(a), and did not fall within the continuing violation doctrine. We affirm.

I.

We derive the following facts from the evidence submitted by the parties in support of, and in opposition to, the summary judgment motions, viewed in the light most favorable to plaintiff. Elazar v. Macrietta Cleaners, Inc., 230 N.J.

123, 135 (2017). Plaintiff is a woman of Irish, German, Indian, and African-American descent. At the times relevant to this appeal she was a corrections officer at the Union County Jail. Burkert, a white male, was a sergeant at the jail, a first-list supervisory position. His brother, who also worked at the jail, was a delegate for PBA Local 199 (union) representing officers at the facility. Riordan was the Director of the county's Department of Corrections. He had disciplinary control and oversight of corrections officers at the jail.

In June 2008, shortly after plaintiff was hired, she had a tense exchange with Burkert. According to plaintiff, Burkert appeared before a group of newly hired corrections officers and informed them that in order to stay in the good graces of the union, they may not accept overtime hours for the first ninety days of their employment. Plaintiff, whose mother was a supervisor at the jail, challenged Burkert in front of the other officers, asserting that no prohibition on overtime hours exists for new officers. She also inferred that Burkert needed overtime hours to satisfy his alimony payments. Plaintiff alleged that Burkert told her she was going against the union.

In 2011, plaintiff ran for election to the position of trustee at the union. She alleged Burkert told another employee that his brother would do everything in his power to make sure plaintiff did not get any votes and would keep her

from receiving an administrative position. Plaintiff lost the election and challenged the results, which upset members of the union. A union official thereafter initiated an investigation into whether plaintiff was stealing county time, which she alleged was in retaliation for her decision to appeal the election results. Union officers accused plaintiff of illegally wearing a wire, and told union members not to trust plaintiff because she was a rat. Plaintiff conceded that other officers who challenged the union were treated in a similar manner.

Plaintiff filed an internal harassment and hostile work environment complaint with her employer based on her treatment by union officers. The county began an investigation into Burkert and his brother. Plaintiff ultimately withdrew the complaint and her appeal of the election results when the union posted a letter that exonerated her of wrongdoing and declared her a union member in good standing.

After the issues with the union were resolved, plaintiff alleged that Burkert continued to harass her. In October 2012, plaintiff met with Riordan to complain about Burkert's behavior. Riordan advised plaintiff to file a report with John Boles, the county's Affirmative Action Officer.

On October 3, 2012, plaintiff filed a harassment complaint with Boles alleging:

1. On September 3, 2011, Burkert became angry with plaintiff for failing to secure a piece of broken metal on her post properly. Plaintiff was under the belief that she could secure the metal without informing her supervisor right away. However, Burkert told her that she needed to call him immediately in such circumstances. While out of view of other employees, Burkert chastised plaintiff and told her he's "got her ass" and that she would "fucking get it." Plaintiff stated that she feared that he was going to harm her physically. She was not disciplined for this incident, but stated that she believed Burkert's behavior was due to her union activities.

2. On November 25, 2011, Burkert pulled another officer off their post in order to inquire about plaintiff.

3. On June 19, 2012, Burkert yelled and flailed his arms at plaintiff for having pepper spray on her person while on duty, which was a violation of county rules. She was required to submit an operations report but was not disciplined. Plaintiff felt afraid during the incident because Burkert looked like he was losing control.

4. On July 3, 2012, Burkert entered the booking area even though he was not assigned there and stared at plaintiff for five to ten seconds. Burkert did not speak to plaintiff but told another officer to put his handcuffs on his belt and then left the area.

5. On July 24, 2012, plaintiff asked Burkert for permission to move her car. He told her to stand by, and later started screaming over the radio at plaintiff, directing her to not to leave her post. An elevator had been called to plaintiff's floor, which Burkert assumed meant plaintiff had ignored his order.

A-1886-17T4

6. On August 18, 2012, Burkert entered plaintiff's work area in the booking office, which Burkert was known to not frequent often, and stared at her for five to ten seconds before leaving without incident.

7. On August 19, 2012, Burkert screamed at plaintiff because he erroneously believed she was improperly wearing pepper spray. Burkert told her not to get snippy with him when she demonstrated that she was not wearing pepper spray. Plaintiff stated that she was scared for her physical well-being because Burkert's behavior was aggressive and escalating.

8. On October 3, 2012, Burkert was assigned as plaintiff's direct supervisor in the medical unit. In an attempt to avoid working with Burkert, plaintiff tried switching assignments with another officer but Burkert denied the switch. During the shift, plaintiff was called to the shift commander's office. Burkert thought plaintiff had abandoned her post and screamed at her for not finding a replacement.

9. On October 4, 2012, plaintiff again wanted to switch her post to avoid Burkert, who was supervising her overtime assignment. She went over Burkert's head to the shift commander to obtain the switch because she knew Burkert would have denied the request. When Burkert found out about the switch, he attempted to stop it and gave plaintiff a verbal reprimand.

Plaintiff concedes Burkert never used racist or sexist language during these encounters. She believes, however, that his animosity towards her stems from her being a female who stood up for herself.

A-1886-17T4

On September 13, 2013, Boles sent plaintiff the results of the investigation. Although the investigation concluded that some of plaintiff's allegations of harassment were unsubstantiated, it found other allegations were proven. The county determined that Burkert's harassment was not based on plaintiff's race or gender. Burkert received a thirty-day suspension and entered into a "last chance" agreement with the county, which provided that any further discipline would result in his termination.

In light of the investigative findings, Riordan issued a directive that Burkert not directly supervise plaintiff. Since the establishment of the directive, plaintiff has never worked with Burkert as her supervisor, and she testified that in those instances when Burkert was assigned as her supervisor, he was immediately reassigned on her request.

After issuance of the report but prior to the imposition of discipline, plaintiff met with Riordan. He informed her that he was going to attempt to terminate Burkert, but Burkert had rights with respect to termination and discipline.

Plaintiff alleged three incidents involving Burkert occurred while the investigation was underway. She acknowledged that she did report those incidents to the county. According to plaintiff, on December 2, 2012, Burkert

yelled at both plaintiff and another officer for abandoning their post. However, plaintiff was properly relieved from her post, and once she demonstrated that fact the incident ended.

On January 3, 2013, plaintiff was assigned to the laundry. Burkert came down and asked why inmates were not present. After plaintiff explained that the inmates were still eating breakfast, Burkert lost his temper and called another officer demanding that the inmates be brought to the laundry immediately. Finally, on September 9, 2013, Burkert yelled over the radio at another officer while plaintiff was present.

Plaintiff alleged additional incidents occurred after the county investigation was complete. On December 30, 2013, Burkert entered the control center, where plaintiff was present and wearing her suicide knife, and said that he was going to start writing up officers who were not wearing a suicide knife.[1] On March 11, 2014, while plaintiff was assigned to the medical unit, Burkert pushed an inmate's face into a glass door and looked at plaintiff while doing so.

On May 14, 2014, plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC). She alleged she was harassed by Burkert and that the county failed to take appropriate disciplinary action against him.

---

[1] A suicide knife is a tool to cut a noose in the event of an inmate suicide attempt.

While the EEOC complaint was under investigation, plaintiff filed a complaint with the county alleging continued harassment by Burkert. She alleged Burkert overheard two officers discussing plaintiff's complaints against him and ordered them to submit a report. She also alleged Burkert was filing reports with her name in them when she had nothing to do with the situations detailed in the reports. Plaintiff alleged that this demonstrated Burkert's obsession with her.

On December 2, 2014, plaintiff filed another complaint with the county. She alleged that on October 20, 2014, Burkert was in the control center staring at her through the glass. Plaintiff alleged she had to have another officer return her keys to avoid Burkert. Additionally, plaintiff alleged that while she was clocking out, Burkert appeared and stayed there in order to intimidate her.

On March 3, 2015, Boles sent plaintiff the results of the investigation of her internal complaints, concluding Burkert did not violate any county policy. Boles stated that he doubted Burkert committed the alleged actions because he was aware he was operating under a "last chance" agreement and "a reasonable man would not jeopardize his job to engage in such an encounter as described[.]" In addition, he concluded "Burkert was not attempting to harm or harass" plaintiff and his conduct did not constitute harassment.

9

On December 14, 2014, the EEOC issued its final determination. It found plaintiff was subject to discrimination because of sex and race, and retaliation. In addition, the EEOC concluded that despite the county stating it took appropriate corrective action, plaintiff continued to be subject to harassment in an "egregious and threatening manner." The agency determined the county failed to take effective remedial action against Burkert after receiving complaints from plaintiff and other African-American female employees.

Plaintiff alleged no instances of direct harassment by Burkert after 2014. However, plaintiff alleged that Burkert is harassing coworkers who are her friends in order to get to her. At her deposition, plaintiff conceded she has no proof that Burkert's interactions with these officers are motivated by a desire to harass her, or that he even knows they are plaintiff's friends.

On July 22, 2015, plaintiff filed a complaint in the Law Division alleging Burkert harassed her based on race and gender, and as a form of retaliation, on a continuous and regular basis since May 2011 in violation of the LAD. She alleged that Riodan and the county aided and abetted Burkert by failing to take sufficient measures to discipline him and protect her from his harassment. Plaintiff also alleged claims of intentional infliction of emotional distress, common law assault, negligence, reckless or intentionally deficient supervision

and retention, violation of terms of employment, and breach of covenant of good faith and fair dealing. She sought compensatory and punitive damages.

After the close of discovery, defendants moved for summary judgment. On November 27, 2017, the trial court issued an oral opinion granting their motions. The court concluded that plaintiff's claims were time-barred. Noting that the complaint was filed on July 22, 2015, and that claims under the LAD are subject to a two-year limitations period, the court examined each incident alleged to have taken place after July 22, 2013, and determined that plaintiff failed to produce proof suggesting any of the incidents were based on her race or gender, or constituted retaliation under the LAD. The court instead found that the only evidence in the record of motive was Burkert's animus towards plaintiff's union activities and her challenge to the results of the union election.

The court found just one allegation "that would remotely suggest" discriminatory acts by Burkert based on plaintiff's race or gender: her June 2012 encounter with Burkert regarding plaintiff wearing a can of pepper spray while on duty. Plaintiff alleged that Burkert did not have the same reaction to white female employees or male employees who also had pepper spray in the jail. This event, however, took place prior to July 22, 2013, and was, therefore, time barred. The court concluded that because plaintiff produced no evidence of

discrimination after July 22, 2013, the continuing violation doctrine did not permit the late filing of claims related to the June 2012 incident.

On November 17, 2017, the trial court entered three orders, each granting summary judgment in favor of one of the defendants.[2]  This appeal followed.

II.

Plaintiff argues the trial court erred in finding her LAD claims were time-barred, misapplied the continuing violation doctrine, and failed to recognize the cumulative pattern of ongoing harassment she suffered directly related to her race and gender.  We disagree.

> We review [a] motion for summary judgment using the same standard applied by the trial court—whether, after reviewing "the competent evidential materials submitted by the parties" in the light most favorable to [the non-moving party], "there are genuine issues of material fact, and, if not, whether the moving party is entitled to summary judgment as a matter of law."
>
> [Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).]

---

[2]  The court also granted summary judgment in favor of defendants on plaintiff's common law claims.  Plaintiff does not address those claims in her brief.  We therefore deem any arguments with respect to those claims waived.  "[A]n issue not briefed is deemed waived."  Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2019); Telebright Corp. v. Dir., N.J. Div. of Taxation, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief).

12

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.'" Id. at 24 (quoting Bhagat, 217 N.J. at 38).

The burden of proving discrimination "remains with the employee at all times." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005). To establish a cause of action under the LAD based on hostile work environment, the plaintiff must satisfy four elements:

> Specifically, [plaintiff] must show that the complained-of conduct (1) would not have occurred but for the employee's protected status, and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive.
>
> [Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24 (2002).]

The statute of limitations for LAD claims is two years. Alexander v. Seton Hall Univ., 204 N.J. 219, 228 (2010). "Determining when the limitation period begins to run depends on when the cause of action accrued, which in turn is affected by the type of conduct a plaintiff alleges to have violated the LAD." Ibid. "Discriminatory termination and other similar abrupt, singular adverse

employment actions that are attributable to invidious discrimination, prohibited by the LAD, generally are immediately known injuries, whose two-year statute of limitations period commences on the day they occur."  Ibid.

Claims of harassment, however, may be based on a number of allegedly discriminatory acts constituting a pattern of behavior.  The continuing violation doctrine is a "judicially created doctrine . . . developed as an equitable exception to the statute of limitations."  Bolinger v. Bell Atl., 330 N.J. Super. 300, 306 (App. Div. 2000).  As our Supreme Court explained, "when the complained-of conduct constitutes 'a series of separate acts that collectively constitute one unlawful employment practice[,]' the entire claim may be timely if filed within two years of 'the date on which the last component act occurred.'"  Alexander, 204 N.J. at 230 (alteration in original) (quoting Roa v. Roa, 200 N.J. 555, 567 (2010)).  The Court warned, however, "[w]hat the doctrine does not permit is the aggregation of discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable."  Roa, 200 N.J. at 569.

Plaintiff concedes that she was not subject to a discrete adverse employment action at any time, either before or after the July 22, 2013 limitations period.  She instead alleged a pattern of harassing acts by Burkert

that began prior to July 22, 2013, and continued through the filing of the complaint. Our review of the record, in light of the applicable legal standards, leads us to the same conclusion reached by the trial court: plaintiff did not raise a genuine issue of material fact on which a reasonable jury could conclude Burkert's alleged harassing behavior on any occasion after July 22, 2013, was motivated by plaintiff's race or gender. Burkert made no explicit reference to plaintiff's race or gender and no verbal remarks that could reasonably be interpreted as suggesting a discriminatory intent on his part. Nor could a discriminatory intent be implied from Burkert's prior interactions with plaintiff.

The incidents alleged by plaintiff to have taken place after July 22, 2013, if accepted as true and interpreted in the light most favorable to her, amount to Burkert: (1) carrying out his responsibilities as a sergeant by making a general statement to a group of employees that included plaintiff; (2) acting in an unfriendly, and possibly intentionally intimidating, manner by briefly staring at plaintiff, appearing where he knows she might be present, or yelling at another employee over a radio; (3) incorrectly including her name in incident reports; (4) directing employees to write an incident report about plaintiff; and (5) harassing plaintiff's coworker friends. While plaintiff paints a picture of an unpleasant colleague intent on making her uncomfortable at work, she cannot

15

demonstrate that his acts after July 22, 2013, were motivated by racial or gender animus. The record suggests instead that Burkert and plaintiff have a history of tension associated with union activity that began almost immediately after plaintiff started working at the jail.

While we do not condone Burkert's behavior, the LAD is not intended to be a general workplace civility code. Discourtesy or rudeness should not be confused with racial or gender discrimination. Herman v. Coastal Corp., 348 N.J. Super. 1, 21 (App. Div. 2008); see also Shepherd, 174 N.J. at 25. Plaintiff has not produced evidence that Burkert's acts after July 22, 2013, while inappropriate and, perhaps, worthy of discipline, were unlawful discrimination under the LAD. The trial court correctly dismissed plaintiff's complaint as time barred.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION